130 N.J. Super. 245 (1974)
326 A.2d 90
MONSANTO COMPANY, PLAINTIFF,
v.
ALDEN LEEDS, INC., ET AL., DEFENDANTS.
Superior Court of New Jersey, Law Division.
September 6, 1974.
*248 Mr. William H. Hyatt, Jr., argued the motion for plaintiff (Messrs. Pitney, Hardin & Kipp, attorneys).
Mr. William V. Kennedy, argued the motion for defendant (Messrs. Kennedy and Brogan, attorneys).
DREIER, J.D.C., Temporarily Assigned.
Plaintiff has moved for summary judgment on its claim for goods sold and delivered. The goods in question are large quantities of dry organic chlorine, patented and trademarked under the *249 designation ACL-60 and ACL-85. Defendant Alden Leeds, Inc. acknowledges receipt of these goods under a written contract for the amount of $1,056,577.73, as well as goods on open account in the amount of $38,058.86. Plaintiff's claim is for these amounts, plus interest and costs of suit. Defendant Alden Leeds, Inc. and the other named defendants (who are individual and corporate guarantors of Alden Leeds, Inc.'s obligations) have counterclaimed, alleging that a portion of the goods sold and delivered were defective and that these defects caused extensive consequential damage to defendant Alden Leeds, Inc. The sales price of the allegedly defective goods is approximately $150,000.
The factual picture is relatively simple. The chemicals in question were purchased by defendant Alden Leeds, Inc. from plaintiff under a contract which provided for application of Missouri law. The goods were delivered and stored in defendant's manufacturing plant which was owned by a related corporation Leeds Terminal Inc. Defendant alleges that moisture problems developed with the chemicals, and that from time to time chlorine gas would escape and a container of the chemicals would spontaneously ignite. On July 26, 1971 the product allegedly caused extensive property damage to 2145 McCarter Highway, Newark. On August 10, 1971 a fire occurred at a reserve location of Alden Leeds, Inc. in Kearny, N.J., causing severe damages to the building, equipment, electrical installations, raw materials and inventory; and on April 10, 1972 a third fire occurred in a building located in Kearny, N.J. (also owned by defendant), causing severe damage to building, equipment, electrical systems, raw materials, and inventory. In addition, defendant alleges that there were numerous smaller fires which were directly traceable to plaintiff's product. The property damage claims and business losses for Alden Leeds, Inc. are alleged to equal or exceed the main claim by Monsanto, and defendant Alden Leeds, Inc. asserts further that its property damage claims at 2145 McCarter Highway approximate $405,000, with its landlord, Leeds Terminal, Inc. *250 having an independent claim for the replacement cost of the building of approximately $1,560,000.
Plaintiff has moved for summary judgment, but the real issues in the case arise under defendant's counterclaim which raises several points of first impression in New Jersey, including: (1) May a claim for strict liability in tort be maintained by either (a) a commercial processor or (b) its landlord, against a supplier of the allegedly defective material? (2) May general disclaimers in a contract for the sale of commercial materials encompass claims for strict liability in tort? and (3) Does a provision for the prohibition of incidental or consequential damages in a commercial contract encompass claims for strict liability in tort? There are also subsidiary issues in this case concerning the applicability of Missouri law to the contract or tort claims.
By cross-motion defendant Alden Leeds, Inc. has sought leave pursuant to R. 4:33 to permit Leeds Terminal, Inc., a corporation with common stockholders, and the owner of the plant or warehouse in which the chemicals were stored, to intervene in the action, so as to assert its claim against plaintiff for the destruction of the premises.
The contract for the sale of the chemicals contained the following warranty provision (defendant is referred to as the "distributor" in the agreement):
WARRANTY  Unless otherwise provided herein, Monsanto warrants title and that all goods sold hereunder shall conform to Monsanto's standard specifications. Subject to the preceding sentence and except as otherwise explicitly stated herein, MONSANTO MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESSED OR IMPLIED, AS TO MERCHANTABILITY, FITNESS FOR PARTICULAR PURPOSE OR ANY OTHER MATTER WITH RESPECT TO THE GOODS, whether used alone or in combination with other substances. Monsanto shall not be liable for and Distributor assumes responsibility for all personal injury and property damage resulting from the handling, possession or use of the goods by distributor. [emphasis supplied]
In addition there is a statement concerning remedies as follows:
*251 Distributor's exclusive remedy and Monsanto's limit of liability for any and all losses or damages resulting from defective goods or from any other cause shall be for the purchase price of the particular delivery with respect to which losses or damages are claimed plus any transportation charges paid by distributor. In no event shall Monsanto be liable for incidental or consequential damages.

I
Initially, with respect to the cross-motion for Leeds Terminal, Inc. to intervene pursuant to R. 4:33-2, it is clear that the motion should be granted. The rule provides:
Upon timely application anyone may be permitted to intervene in an action if his claim or defense and the main action have a question of law or fact in common. When a party to an action relies for ground of claim or defense upon any statute or executive order administered by a state or federal governmental agency or officer, or upon any regulation, order, requirement or agreement issued or made pursuant to the statute or executive order, the agency or officer upon timely application may be permitted to intervene in the action. In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.
Plaintiff claims that there would be an unreasonable delay if the intervention is permitted, since the case is now approaching the pretrial conference stage. The problem with such an argument is that there are common questions here which would take far more time to try in a second case. Monsanto did not make Leeds Terminal a party to the action since it was not liable for the purchase price of the goods. But, even though the principals of the landlord and defendant are the same, the counterclaim for damages would not adjudicate perhaps the largest single item of damages caused by the fires, the value of the Leeds Terminal building. Also, if it is determined that the contract between Alden Leeds, Inc. and Monsanto precludes the imposition of consequential damages against Alden Leeds, Inc., the real issue in the case may be between Leeds Terminal, Inc. and Monsanto.
*252 Monsanto also has asked for summary judgment for the acknowledged balance due it for the nondefective chemicals, and for immediate execution against defendant. The last-quoted rule in its final sentence shows that this court must consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties. This court is of the opinion that such execution should not be permitted, even if summary judgment is granted in accordance with this opinion (upon the taking of the testimony noted hereafter), until such time as the rights of Leeds Terminal, Inc. have been adjudicated, in order to accomplish substantial justice to the parties. Plaintiff, therefore, will not be delayed or prejudiced by having the rights of Leeds Terminal, Inc. determined in these proceedings. As to the substantive rights of the landlord, see the discussion infra.

II
The first issue raised with respect to the summary judgment motion is directed to defendant's counterclaim for breach of express or statutory warranties. Since the contract specifies the law to govern its interpretation, and public policy does not dictate otherwise, the contract will be interpreted under Missouri law. Shotwell v. Dairymen's League Co-op Ass'n, 22 N.J. Misc. 171 (D. Ct. 1944).
There is no question in this case that defendant's claims are primarily for consequential damages. Therefore, § 2-719(3) of the Missouri Uniform Commercial Code, Vernon's Annotated Missouri Statutes (hereafter V.A.M.S) § 400.2-719(3) is relevant. (See also N.J.S.A. 12A:2-719 (3) for similar language.) This provision states that:
Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not.
*253 Also, V.A.M.S. § 400.2-316 (and N.J.S.A. 12A:2-316) permits the exclusion or modification of express warranties (V.A.M.S. § 400.2-313) and even the statutory implied warranties (V.A.M.S. § 400.2-314). Identical provisions are set forth in the corresponding sections of the New Jersey Uniform Commercial Code.
Case law in both Missouri and New Jersey generally permits the allocation of risks. See Rock Springs Realty, Inc. v. Waid, 392 S.W.2d 270, 272 (Mo. Sup. Ct. 1965); Monsanto Chemical Co. v. American Bitumuls Co., 249 S.W.2d 428, 431 (Mo. Sup. Ct. 1952); Moreira Constr. Co. v. Moretrench Corp., 97 N.J. Super. 391, 394-396 (App. Div. 1967), aff'd o.b. 51 N.J. 405 (1968). Also, see the further discussion of this point, infra, as such allocation clauses relate to tort claims. In the same respect, this court must consider § 2-302 (V.A.M.S. § 400.2-302; N.J.S.A. 12A:2-302, "Unconscionable Contract or Clause") which reads as follows:
(1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.
(2) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination.
This court reads § 2-719(3), by its use of the word "unconscionable," as incorporating the standards set forth in § 2-302(1) and (2). Specifically, this finding of unconscionability is a matter of law to be determined by the court, without a jury, although there may be a taking of evidence under subsection 2 of the last-cited statute as to the contract's commercial setting, purpose and effect. (As is noted hereafter, this testimony is equivalent to that which the court will require to determine whether the damage and *254 remedy limitation provisions of the contract were intended to encompass tort claims arising out of any negligence or strict liability questions, both of these latter questions also concerning contractual interpretation, and thus for the court sitting without a jury.) If this court finds that the consequential damages limitation was unconscionable within the meaning of the cited sections of the Uniform Commercial Code, then plaintiff's summary judgment motion to strike defendants' warranty claim will be denied; if the converse is determined, the motion will be granted as to the warranty claim. Cf. Collins v. Uniroyal, 126 N.J. Super. 401, 406-407 (App. Div. 1973), aff'd 64 N.J. 260 (1974), applicable to the consumer situation.

III
In the event the limitation is found unconscionable, the next issue within the warranty area will be which of the parties may assert this breach of warranty. Although there is no question that Alden Leeds, Inc. can assert the breach of warranty, its landlord, Leeds Terminal, Inc., does not fall within the statutory class of permissible plaintiffs. Section 2-318 of the Missouri and New Jersey Uniform Commercial Codes reads:
A seller's warranty whether express or implied extends to any natural person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty. A seller may not exclude or limit the operation of this section.
This provision was recently interpreted in Heavner v. Uniroyal Inc., 63 N.J. 130, 153-154 (1973), quoting extensively from the Official Comment. This discussion (and the numerous articles on the subject) leads this court to the conclusion that even the proposed amendments set forth in footnote 14 in the Heavner opinion (63 N.J. at 154) do not foretell the broad scope of potential liability for breach of *255 warranty, as development in this area runs parallel to the expanding area of strict liability in tort.
But insofar as the statutory warranties are concerned, § 2-318 of the Uniform Commercial Code extends such a warranty only to a natural person who is in the family or household of his buyer or who is a guest in his home, if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty. The corporate landlord in the case at bar would not so qualify, however illogical this distinction may be. A seller making a warranty concerning a product that can cause damage to the physical area in which the product is located should be aware that substantial damage could arise if the product is defective, and should be held liable to guard against such loss at least as provided in the proposed amendment to § 2-318. See also, Prosser on Torts (4 ed. 1971), at 568. But it is not the duty of the courts to amend the statute where the Legislature has spoken. Therefore, under New Jersey law the statutory breach of warranty claims would not be available to Leeds Terminal, Inc., or to any party other than the contract purchaser, or the limited class set forth in § 2-318.
Missouri has taken the view that the implied statutory warranty and strict liability claims should be treated in the same manner. Keener v. Dayton Electric Mfg. Co., 445 S.W.2d 362, 364 (Mo. Sup. Ct. 1969); Hales v. Green Colonial Inc., 490 F.2d 1015, 1022 (8 Cir.1974). New Jersey has taken a similar position, at least in "defect" cases. See Realmuto v. Straub Motors Inc., 65 N.J. 336, 345 (1974). Since the warranty claim under the contract, governed by Missouri law, would be treated in the same manner as a strict liability claim, and, as noted later, the tort claims would be approached under New Jersey law (Mellk v. Sarahson, 49 N.J. 226 (1967)), the substantive basis for liability may be phrased in terms of our tort theory. A fuller consideration of the standing of the landlord under the warranty theory may be put off until a more appropriate case is presented. *256 As is noted infra, there is also a great similarity between the law in Missouri and New Jersey in the strict liability area.

IV
The harder question in this case is defendants' claim based upon strict liability in tort, and the applicability of this doctrine to a commercial user. First, it should be noted that the law governing this case with respect to the tort claim will be New Jersey law. See Mellk v. Sarahson, supra, where the court noted that, although there should be no mechanical application of the lex loci delicti to all choice of law problems in tort cases, the law to be applied should be that of the state having the greatest interest in the case in question. 49 N.J. at 228-230. In this case the chemical was shipped into the State of New Jersey where the plaintiff knew or should have known that any defect in its product would have effect. Defendant maintained its plants in New Jersey, intended to process the chemicals here, and the actual losses suffered by defendants occurred in this State. This court has no hesitancy in applying New Jersey law to the tort claim.
New Jersey's decisional law with respect to strict liability in tort is perhaps the broadest in the country. Starting with the early cases (phrased in the warranty terminology) of Henningsen v. Bloomfield Motors Inc., 32 N.J. 358, 409-412 (1960), and Cintrone v. Hertz Truck Leasing & Rental Service, 45 N.J. 434, 451-453 (1965), and running through the true strict liability cases commencing with Santor v. A & M Karagheusian, Inc., 44 N.J. 52, 63-67 (1965), and down to the most recent case of Realmuto v. Straub Motors Inc., supra, 65 N.J. at 344, our Supreme Court has shown itself willing to expand this field in order to fulfill the public's expectation of responsibility for products placed in the stream of commerce. As the court stated in Santor:
*257 * * * The obligation of the manufacturer thus becomes what in justice it ought to be  an enterprise liability, and one which should not depend upon the intricacies of the law of sales. The purpose of such liability is to insure that the cost of injuries or damage, either to the goods sold or to other property, resulting from defective products, is borne by the makers of the products who put them in the channels of trade, rather than by the injured or damaged persons who ordinarily are powerless to protect themselves. * * * [44 N.J. at 65]
It is true that the courts of this State have never in a reported opinion applied this strict liability theory to a commercial claimant, but such cases are not unknown in the country as a whole. The leading case is Randy Knitwear, Inc. v. American Cyanamid Co., 11 N.Y.2d 5, 226 N.Y.S.2d 363, 181 N.E.2d 399 (Ct. App. 1962). The court there noted:
We perceive no warrant for holding  as the appellant urges  that strict liability should not here be imposed because the defect involved, fabric shrinkage, is not likely to cause personal harm or injury. * * * And this makes sense. Since the basis of liability turns not upon the character of the product but upon the representation, there is no justification for a distinction on the basis of the type of injury suffered or the type of article or goods involved. [11 N.Y.2d at 15, 226 N.Y.S.2d at 369-370, 181 N.E.2d at 403-404]
Although the Randy Knitwear case is phrased in the warranty terminology, the case could as well be phrased in strict liability in tort, since the case involved an alleged defect in the product causing the injury to plaintiff. As our Supreme Court noted in Santor:
Under the strict liability in tort doctrine, as in the case of express or implied warranty of fitness or merchantability, proof of the manufacturer's negligence in the making or handling of the article is not required. If the article is defective, i.e., not reasonably fit for the ordinary purpose for which such articles are sold and used, and the defect arose out of the design or manufacture or while the article was in the control of manufacturer, and it proximately causes the injury or damage to the ultimate purchaser or reasonably expected consumer, liability exists. * * * [44 N.J. at 66-67]
*258 Other courts have considered the problem of a commercial plaintiff in a strict liability situation. In Iowa Electric Light & Power Co. v. Allis-Chalmers Mfg. Co., 360 F. Supp. 25 (S.D. Iowa 1973), the court reviewed the law throughout the country on this question and determined that the Supreme Court of Iowa would not permit a recovery by a commercial plaintiff in a strict liability situation. In doing so, however, the court distinguished the New Jersey cases and instead followed Seely v. White Motors Co., 63 Cal.2d 9, 45 Cal. Rptr. 17, 403 P. 2d 145 (1965), in which the Supreme Court of California held that an action for the purchase price and lost profits could not be sustained on the theory of strict liability in tort, but only on the basis of breach of warranty. The federal Judge in Iowa, after extensive citation of cases, following both the New Jersey and California rules determined that Iowa would not allow recovery of the type of damages plaintiff was seeking under the theory of strict liability in tort.[1]
One of the most cogent opinions applying the strict liability doctrine to a commercial consumer is the Michigan case of Cova v. Harley Davidson Motor Co., 26 Mich. App. 602, 182 N.W.2d 800 (App. Ct. 1970). This case brings together the cases of "strict liability" and "implied warranty" under a single term "products liability." Under this theory of products liability the Michigan court permitted the cost of repair of golf carts to be recovered, leaving open for further determination whether plaintiffs there could recover for the loss of business profits, i.e., an economic loss, predicated upon a finding of inequality of bargaining position between the parties. This case was also cited by the Iowa federal court in Iowa Electric Light & Power Co. even though a contrary *259 result was reached. Other courts have allowed recovery for economic losses in strict liability cases. See Air Products and Chemicals, Inc. v. Fairbanks Morse, Inc., 58 Wis.2d 193, 206 N.W.2d 414 (Sup. Ct. 1973); Arrow Transportation Co. v. Fruehauf Corp., 289 F. Supp. 170 (D.C. Or. 1968); Kassab v. Central Soya, 432 Pa. 217, 246 A.2d 848 (Sup. Ct. 1968); Morrow v. Caloric Appliance Corp., 372 S.W.2d 41 (Mo. Sup. Ct. 1963); State Farm Mut. Auto Ins. Co. v. Anderson-Weber, Inc., 252 Iowa 1289, 110 N.W.2d 449 (Sup. Ct. 1961). Other courts, however, have held to the contrary. See Price v. Gatlin, 241 Or. 315, 405 P.2d 502 (Sup. Ct. 1965); Southwest Forest Industries, Inc. v. Westinghouse Electric Corp., 422 F.2d 1013 (9 Cir.1970), cert. den., 400 U.S. 902, 91 S.Ct. 138, 27 L.Ed.2d 138 (1971).
Unlike the difficulty faced by the Iowa and other courts, this court has the benefit of a line of New Jersey cases pointing to the expansion of the field of strict liability and, therefore, has no difficulty finding that Santor would be applied by our Supreme Court as encompassing a commercial loss. Even in these days of consumerism, economic interests are not out of favor. Injuries to a man's business can be as detrimental to our society as injuries to his person. Severe injuries to a family's economic life can be devastating. Corporations are, in the last analysis, owned by people who rely upon them for income, and thus commercial losses often are reflected in personal sorrow. Such a conclusion places the liability where it belongs, with the manufacturer, distributor or retailer, who can in turn, through insurance, spread the cost of injuries due to defective products throughout those further along the distribution system.
In the last analysis, however, the extent to which the strict liability in tort doctrine will be applied to a commercial loss is up to the parties, for, as will be noted hereafter, the parties still have bargaining positions from which they may allocate the loss, providing such allocation is not unconscionable. Absent his explicit agreement, a single injured party, whether *260 it be a corporation or individual, processor-purchaser or eventual user, businessman or household user, should not be required to absorb the cost of the occasional loss, either by payment for insurance or absorbing the damages. Defective products for the commercial market should also give rise to liability to be borne by the enterprise which created the item or placed it in the stream of commerce, unless there is a valid allocation of the risk of loss between the contracting parties.

V
The next issue in this case leads us back to Missouri law, since the parties here entered into an agreement which allocated the risk of "all personal injury and property damage resulting from the handling, possession or use of the goods." The risk of loss was thus clearly placed upon the purchaser, and consequential damages were additionally prohibited. Missouri law permits the allocation of risks in a negligence setting. Sinclair Refining Co. v. Stevens, 123 F.2d 186 (8 Cir.1941), cert. den. 315 U.S. 804, 62 S.Ct. 632, 86 L.Ed. 1203 (1942); Rock Springs Realty, Inc. v. Waid, supra; Monsanto Chemical Co. v. American Bitumuls Co., supra. As noted earlier in the opinion, the Uniform Commercial Code makes specific reference to such disclaimers of warranties, and the same may be enforced in a commercial setting so long as there is no finding of unconscionability by the court. But such allocation agreements are to be interpreted so as to carry out the reasonable expectations of the parties. Since the parties may allocate their risks for express and implied warranties, and for their negligence (Mayfair Fabrics v. Henley, 48 N.J. 483, 488-489 (1967); Cozzi v. Owens Corning Fiber Glass Corp., 63 N.J. Super. 117, 125-127 (App. Div. 1960)), in a commercial setting, reason does not dictate that a different rule should apply to the risk of liability under strict liability in tort. The Code standards can well be our guide, even in this tort situation.
*261 In the commercial setting, unconscionability should no more be presumed with respect to strict liability in tort than with respect to warranty. Cf. N.J.S.A. 12A:2-719(3). But neither should it be conclusively presumed that oppression and unfair surprise are absent, so that a contractual liability limitation is always found sound in the commercial setting. Both the Uniform Law Commissioners and the New Jersey Study Comments to § 2-302 speak to this issue:
* * * These cases make it clear that the effect of the unconscionability rule is not designed to upset the terms of a contract resulting from superior bargaining strength, but to prevent oppression and unfair surprise. * * * [New Jersey Study Comment, ¶ 1]
* * * The principle is one of the prevention of oppression and unfair surprise [citing cases] and not of disturbance of allocation of risks because of superior bargaining power. * * * [Uniform Law Commissioners' Comment, ¶ 1]
The New Jersey courts have also found the equality of bargaining position in itself not to be the decisive consideration.
In Moreira Construction Co. Inc. v. Moretrench Corp., supra, the court noted:
Unlike Henningsen, which dealt with a manufacturer and an ordinary layman, the instant matter deals with two corporations in a commercial setting. Although plaintiff Moreira is obviously a small corporation, its owner has been engaged in the construction business for 18 years.
Furthermore, in Henningsen the courts noted that the clause in question was a standardized one and used throughout the automotive industry, 32 N.J. at p. 390, thus leaving the consumer with no alternative but to accept the terms of the contract as stated. In 1958 defendant Moretrench Corp. was the world's largest well point company. Ivy H. Smith Co. v. Moretrench Corp. 253 F.2d 688, 689 (5 Cir. 1958). However, there was testimony to the effect that there were three competitors of defendant in the area and there was no showing that plaintiff was precluded from negotiating a contract on more favorable terms. [97 N.J. Super. at 395]
The inequality of bargaining position and the availability of alternatives will be taken into consideration only as factors bearing on "surprise" and "oppression" mentioned in the Code *262 Comments. However, from the final sentence in the Moreira Construction Co. Inc. opinion it is clear that the court must not stop its analysis merely at a finding that there was a commercial setting. In our case there is a question of fact (as shown by the parties' conflicting affidavits) as to whether there was any alternative source of the chemicals purchased by defendant, or whether it was possible to purchase the chemicals at all unless the exculpatory clauses were placed in the agreement.
Since it appears to this court that the same rules should apply with respect to the strict liability in tort claims as will be applied in the warranty claim, a hearing must be held as to the contract's commercial setting, purpose and effect, in order to aid the court in determining whether the clause is unconscionable under the circumstances. Cf. § 2-302 of the Uniform Commercial Code. Such a hearing will not entail a determination of whether or not the product was defective, since such a hearing must await the plenary trial in the event the allocation of risk clause is found unconscionable. Even if the clause is unconscionable, it may be that defendant will be precluded by the purchase of an unstable chemical from asserting a strict liability claim for risks inherent in the material it purchased. See Brody v. Overlook Hospital, 127 N.J. Super. 331, 339 (App. Div. 1974). Therefore the scope of the hearing both on the warranty and strict liability claims will be limited to the contract setting and the manifest intentions of the parties.

VI
We must also consider whether the landlord, Leeds Terminal, Inc., may claim the benefit of the strict liability in tort doctrine. As was noted by Dean Prosser, the early rule was that the strict liability of the seller was limited to users or consumers of the product. This also was the rule initially embodied in the Restatement of Torts 2d, § 402A which speaks of injuries to "ultimate users or consumers." But, as Dean Prosser notes, the more recent decisions have expanded *263 the class of plaintiffs so that bystanders are as much entitled to protection as the consumers, and this is now the majority rule. Prosser on Torts (4 ed. 1971), at 663. The Restatement, however, in discussing strict liability limits liability to that occasioned to "the ultimate user or consumer, or his property" and, in a caveat, the American Law Institute expresses no opinion as to whether the rules in the section may not apply "to harm to persons other than users or consumers." In the comment on the caveat, the Institute notes that the courts have not yet applied the strict liability benefits in favor of casual bystanders or others who may come in contact with the product, stating:
* * * There may be no essential reason why such plaintiffs should not be brought within the scope of the protection afforded, other than that they do not have the same reasons for expecting such protection as the consumer who buys a marketed product; but the social pressure which has been largely responsible for the development of the rules stated has been a consumers' pressure, and there is not the same demand for the protection of casual strangers. The Institute expresses neither approval nor disapproval of expansion of the rule to permit recovery by such persons. [Comment O to § 402a]
In New Jersey, however, there has been at least one case that has extended the benefits of the strict liability doctrine beyond the actual users or purchasers of the goods in question. Lamendola v. Mizell, 115 N.J. Super. 514 (Law Div. 1971); and cf. Kuhner v. Marlyn Manor, Inc. 129 N.J. Super. 554 (Law Div. 1974). As noted above, Dean Prosser sees this direction of the law heralded by Elmore v. American Motors Corp., 70 Cal. 2d 578, 75 Cal. Rptr. 652, 451 P.2d 84 (Sup. Ct. 1969), placing "strict liability on the same footing as negligence, as to all foreseeable injuries." Prosser, op. cit. at 663. See also the "innocent bystander" cases collected by Judge Doan in Lamendola v. Mizell, supra, 115 N.J. Super. at 521-524. This line of cases appears to state the better view since, although the purchaser is deemed individually to have relied upon the goods being free from defects, the public also should be deemed to have relied upon *264 the fact that defective goods generally will not be injected into the economy. If we apply the test of a "foreseeable plaintiff," certainly the landlord of the purchaser falls within this class, especially as here where the risk inherent in the defect would be that of fire, and the injury claimed is the destruction by fire of the building where the chemicals were stored. The fact that the loss was economic also should not bar the claim, as has been noted earlier under part IV of this opinion. New Jersey law has not avoided such liability to foreseeable bystanders under other tort doctrines. See the discussion concerning ultra-hazardous and inherently dangerous activities in Majestic Realty Associates, Inc. v. Toti Contracting Co., 30 N.J. 425, 433-439 (1959); and cf. Rodrigues v. Elizabethtown Gas Co., 104 N.J. Super. 436, 445-446 (App. Div. 1969), as to the application of these doctrines only to the risks inherent in the particular activity.

VII
In the event the contract's limitation provisions are enforceable with respect to the initial defendants in this case, this court must then determine whether they should be binding upon the corporate landlord. As noted earlier, the landlord's stockholders and directors are the individual defendants who are also the stockholders and directors of the corporate defendant. In their briefs both parties discussed this issue. Unfortunately, their arguments were directed to the question of Leeds Terminal, Inc.'s intervention, with each party taking the opposite position to that which it would assume with relation to the binding effect of the contractual risk allocation. Thus we have defendants asserting that:
* * * This contract was made for the benefit of Leeds Terminal, Inc. and also for the benefit of the sole stockholders who are that corporation. Certainly, since they are the sole stockholders of both corporations, their interests have been seriously affected by reason of the negligence and breach of warranty on behalf of Monsanto Co. and their personal assets are in jeopardy. * * *
*265 On the other hand, plaintiff claims:
* * * [T]he individual defendant-stockholders themselves decided to manufacture products through one corporate entity, Alden Leeds, and to own real estate through another, Leeds Terminal. Monsanto has respected this separation and has no claim against Leeds Terminal because the corporation has not guaranteed the obligations of Alden Leeds. * * *
Under this fact situation the agreement cannot be held binding upon the landlord, based upon the present record. The piercing of both Alden Leeds, Inc.'s and Leeds Terminal, Inc.'s corporate veils requires a factual determination by the court based upon a showing of the parties' operation in disregard of their corporate forms, fraud or the like. See Whitfield v. Kern, 122 N.J. Eq. 332, 347 (E. & A. 1937); Havey v. Hofmann, 121 N.J. Eq. 523 (Ch. 1937), aff'd 123 N.J. Eq. 589 (E. & A. 1938); Turp v. Dickinson, 100 N.J. Eq. 41 (Ch. 1926); Vreeland v. New Jersey Stone Co., 29 N.J. Eq. 188 (Ch. 1878), aff'd 29 N.J. Eq. 651 (E. & A. 1878); cf. Kugler v. Koscot Interplanetary, Inc., 120 N.J. Super. 216, 254 (Ch. Div. 1972); Consolidated Realty Co. v. Dyers, Finishers & Bleachers Fed'n, 137 N.J. Eq. 413 (Ch. 1946); 1 Fletcher, Cyclopedia of Corporations, §§ 41-41.2 at 166-199 and 1973 Cum. Supp. 46. Therefore the landlord's claim will be barred or allowed based upon the court's findings concerning these issues after a hearing which can be combined with the unconscionability hearing described earlier.

VIII
As to the negligence issue, the ordinary rules of negligence will apply. Even if it is determined that this court was incorrect in its legal determination that the corporate landlord as well as the purchaser itself could assert the strict liability in tort claim, as a foreseeable plaintiff the landlord possesses an independent claim for negligence. This latter claim may or may not be barred, as noted earlier, by the tenant's allocation of risk agreement, and must also await the hearing concerning *266 the binding effect of the agreement upon Leeds Terminal, Inc.
Counsel for defendants shall present an order (1) denying summary judgment, (2) providing for a hearing as to (a) the unconscionability of the disputed contract terms and (b) disregard of the corporate forms, and (3) permitting intervention of Leeds Terminal, Inc., in accordance with this opinion and R. 4:42-1.
NOTES
[1] The judge also opined that the New Jersey courts had retreated somewhat from their position in Santor, citing Moreria Construction Co. Inc. v. Moretrench Corp., 97 N.J. Super. 391 (App. Div. 1967), aff'd o.b. 51 N.J. 405 (1968). But the California courts have also modified their absolute position in Seely. See Gherna v. Ford Motor Co., 246 Cal. App.2d 639, 55 Cal. Rptr. 94 (D. Ct. App. 1966).