**PARAMOUNT AVIATION
CORPORATION,**
Appellant,

v.

**Gruppo AGUSTA; Agusta Aerospace Corporation; Costruzione Aeronautiche Giovanni, Agusta, S.P.A.; Agusta, S.P.A.**

No. 01–1336.

United States Court of Appeals,
Third Circuit.

Argued Jan. 24, 2002.

Opinion Filed May 1, 2002.

Catherine B. Slavin (Argued), Wolk & Genter, Philadelphia, PA, for Appellant.

Rudolph V. Pino, Jr. (Argued), Pino & Associates, White Plains, N.Y. and John R. Altieri, Hackensack, NJ, for Appellees.

Before NYGAARD and STAPLETON, Circuit Judges, and SLEET,* District Judge.

* Honorable Gregory M. Sleet, United States District Judge for the District of Delaware, sitting by designation.

## OPINION OF THE COURT

STAPLETON, Circuit Judge.

### I. *BACKGROUND*

On October 10, 1989, an Agusta 109A helicopter ("the helicopter") crashed in Lacey Township, New Jersey killing the pilot, co-pilot, and three executives of the Trump Organization. Costruzioni Aeronautiche Giovanni Agusta S.p.A. ("CAGA"), a subsidiary of Agusta S.p.A., manufactured the helicopter. CAGA and Agusta S.p.A. are part of Gruppo Agusta, which does business in the United States through a wholly-owned American subsidiary, Agusta Aerospace Corporation ("AAC"). All of these entities are named as defendants in this suit.

CAGA sold the helicopter to AAC in November 1983. AAC then sold it to Soundview Leasing in 1989. Soundview in turn sold it to Clifton Park Association, which ultimately sold it in 1989 to its owner at the time of the accident, FSQ Air Charter Corporation ("FSQ"). After purchasing the helicopter, FSQ entered into a "Management Agreement" with Paramount Aviation Corporation ("Paramount"), the plaintiff/appellant in this suit. Paramount is in the business of providing helicopter management and maintenance services to owners and lessees of helicopters. Pursuant to the Management Agreement, Paramount advised FSQ "in all matters relating to the helicopter." Among other things, it provided FSQ with pilots, performed maintenance, prepared the helicopter for flight, determined whether flight conditions permitted a safe flight, and facilitated the scheduling of flights. Under the Management Agreement, Paramount was an independent contractor providing management and administrative

services to FSQ without any ownership interest in the helicopter and without any right to use it for its own account.[1]

AAC operated a helicopter maintenance facility and Paramount would from time to time engage its services to repair and maintain FSQ's helicopter. The record contains no evidence of a written agreement between Paramount and AAC. Paramount would refer to AAC problems and complaints about the helicopter, and AAC would investigate the matter and perform whatever maintenance and repairs that it deemed necessary. In each instance, AAC would prepare an invoice covering these services and any replacement parts and forward it to Paramount for payment. There is nothing in the record to suggest, and we do not understand AAC to contend, that the services performed on FSQ's helicopter were performed under the terms of its original sale of the craft to Soundview Leasing.

In this suit, Paramount asserts a strict liability claim against all of the Agusta defendants alleging that the accident was caused by a defect in one of the main rotor blades. It also asserts a negligence claim against AAC, alleging that it was negligent in performing services on the helicopter when addressing complaints about certain vibration problems.

Paramount does not claim that any of its property was damaged or destroyed in the crash. Its claims are solely for economic losses. Specifically, it alleges that as a result of the accident all Agusta Model 109A helicopters were grounded. This caused Paramount to lose the profit it would have otherwise received under the Management Agreement as well as the profit it would have received under other agreements it had for managing other

109A helicopters. Paramount further alleges that media coverage of the accident produced a negative public perception resulting in a downturn of its business.

The parties to this diversity action agree that it is governed by New Jersey law. The District Court granted summary judgment for the defendants on the sole ground that the economic loss doctrine first articulated in *Spring Motors Distributors, Inc. v. Ford Motor Co.*, 98 N.J. 555, 489 A.2d 660 (1985), bars recovery of economic losses in a tort action. The sole issue before us is whether the teachings of *Spring Motors* and its progeny foreclose Paramount from proceeding here on theories of strict liability and negligence.

## II. *SPRING MOTORS*

*Spring Motors* was a suit by a purchaser of trucks against the dealership from which the trucks were purchased, the truck manufacturer, and the supplier of transmissions to the manufacturer to recover for economic loss allegedly occasioned by defective transmissions in the trucks. The Supreme Court of New Jersey held "that a commercial buyer seeking damages for economic loss resulting from the purchase of defective goods may recover from an immediate seller and a remote supplier in a distributive chain for breach of warranty under the [Uniform Commercial Code], but not in strict liability or negligence." 489 A.2d at 663. The Court explained that in this context "[e]conomic loss can take the form of either direct or consequential damages. A direct economic loss includes the loss of the benefit of the bargain.... Consequential economic loss includes such indirect losses as lost profits." *Id.* at 665.

---

1. Pursuant to the Management Agreement, Paramount served as FSQ's agent "for the sole purpose of establishing accounts in FSQ's name with vendors of helicopter parts and components." App. at 212.

In order to determine the critical issue of whether New Jersey's version of the Uniform Commercial Code ("the U.C.C.") provided the exclusive remedies available to the plaintiff, the Court turned "to the structure and purpose of the Code, which constitutes a comprehensive system for determining the rights and duties of buyers and sellers with respect to contracts for the sale of goods." *Id.* Underlying that scheme, the Court concluded, "is the principle that parties should be free to make contracts of their own choice, including contracts disclaiming liability for breach of warranty." *Id.* at 668. Primarily for this reason, the Court determined that "the U.C.C. is the more appropriate vehicle for resolving commercial disputes arising out of business transactions between persons in a distributive chain." *Id.* Allowing the plaintiff to recover from the manufacturer "under tort principles would," the Court pointed out, "dislocate major provisions of the Code" by, for example, depriving "the seller of the ability to exclude or limit its liability" for economic loss. *Id.* at 671. This, *inter alia*, could foreclose the parties from effecting the most efficient risk allocation.

*Spring Motors* also teaches that a commercial buyer can recover economic losses from the manufacturer of a product who is remote in the chain of distribution under an implied warranty of merchantability. It thus dispensed with the requirement of privity between parties in that chain, i.e., "vertical privity." It pointed to its prior decision in *Santor v. A and M Karagheusian, Inc.*, 44 N.J. 52, 207 A.2d 305 (1965), for the rationale which justified ignoring the lack of privity: A manufacturer, by putting its product in the market for distribution through market channels, represents to all who might buy the product that it is at least merchantable and can reasonably foresee both reliance by buyers and the economic consequences of that reliance.

Twelve years later, the New Jersey Supreme Court was asked to decide whether the teachings of *Spring Motors* governed claims of a *non-commercial* purchaser of a defective boat against the manufacturer and its dealership for direct economic loss. *See Alloway v. General Marine Indus.*, 149 N.J. 620, 695 A.2d 264 (1997). The Court held, as follows:

> By providing for express and implied warranties, the U.C.C. amply protects all buyers—commercial purchasers and consumers alike—from economic loss arising out of the purchase of a defective product. In addition, many buyers insure against the risk of the purchase of defective goods.... Under the U.C.C. as construed by this Court, moreover, the absence of privity no longer bars a buyer from reaching through the chain of distribution to the manufacturer.... Accordingly, we hold that plaintiffs' tort claims are barred.

*Id.* at 275. The *Alloway* court declined to reach the issue as to whether a tort action is nevertheless available where the "defective product poses a serious risk to either property or persons, but has caused only economic loss." *Id.* at 273.

For present purposes, it is important to note that *Spring Motors* and *Alloway* deal exclusively with product liability law in the context of relationships governed by the U.C.C. and with parties in the direct line of the product's chain of distribution. *Spring Motors* does, however, mention in passing that the U.C.C. provides warranty remedies to other parties that can fairly be said to be third party beneficiaries of transactions between parties in the distribution chain. *See* 489 A.2d at 665 (citing N.J. Stat. Ann. § 12A:2–318 (West 1962)). Also, both cases cast the issue for decision in terms of whether allowing the plaintiff a

tort remedy would subvert the statutory scheme embodied in the U.C.C.

### III. *SPRING MOTORS AND THE NEGLIGENCE CLAIM*

The commercial warranty provisions found in Article Two of the U.C.C. apply only to "transactions in goods," and the implied warranty of merchantability, which was the concern of *Spring Motors* and *Alloway*, provides only that such a warranty "is implied in a contract for their sale." *See* N.J. Stat. Ann. §§ 12A:2–102 and 12A:2–314. Moreover, Section 2–701 provides that "[r]emedies for breach of any obligation ... ancillary to a contract for sale are not impaired by the provisions of [Article Two]," and New Jersey's Commentary explains that "this section ... is intended to make it clear that non-sale-type obligations which are associated with a contract of sale (e.g., a promise to repair goods) are not governed by article 2." *See* N.J. Stat. Ann. § 12A:2–701 and § 12A:2–701 cmt. 1.

■■■■ When a contract is for goods and services, a court must determine which aspect of the contract, the goods or the services, predominates. *See Integrity Material Handling Sys., Inc. v. Deluxe Corp.*, 317 N.J.Super. 406, 722 A.2d 552, 555 (1999). In making this determination, a court must examine the whole transaction and look to the essence or main objective of the parties' agreement. *See Tele–Radio Sys. Ltd. v. De Forest Elec.*, 92 F.R.D. 371,

374 (D.N.J.1981). "[C]ourts look to the language and circumstances surrounding the contract, the relationship between the goods and services, the compensation structure and the intrinsic worth of the goods provided." *Integrity Material Handling Sys.*, 722 A.2d at 555.

■■■■ The District Court did not, and could not, on the basis of the current summary judgment record, conclude that the arrangement between Paramount and AAC was predominantly a contract for the sale of goods. If anything, the record suggests that AAC was engaged as a problem solver and provided predominantly maintenance and repair services. *See, e.g., T–Birds, Inc. v. Thoroughbred Helicoptor Serv., Inc.*, 540 F.Supp. 548 (E.D.Ky.1982) (agreement to overhaul helicopter engine predominantly a service contract). It is sufficient for present purposes, however, to say that there is at least a material dispute of fact as to whether the relationship between Paramount and AAC was governed by the U.C.C. This means that we must assume that it was not.[2] Based on that assumption, Paramount's negligence claim is governed by our decision in *Merritt Logan, Inc. v. Fleming Cos. (In re Merritt Logan, Inc.)*, 901 F.2d 349 (3d Cir.1990).

In *Merritt Logan* we applied New Jersey law, including the teachings of *Spring Motors*, to determine the rights of the purchaser of a refrigeration system for its

---

**2.** It is true, as AAC stresses, that contracts for the sale of goods with incidental service components are governed by the U.C.C. *Chatlos Sys., Inc. v. National Cash Register Corp.*, 479 F.Supp. 738, 742 (D.N.J.1979). Agusta does not assert, however, that the original purchase agreement with Soundview Leasing, which is not in the record, contains provisions for the subsequent servicing of the helicopter. It merely argues that the services here at issue would not have been performed but for the original sale of the helicopter.

Appellee's Br. at 13 ("Despite some service aspects regarding the maintenance of the subject helicopter, this transaction involved a sale of goods and is covered by the U.C.C.; without the sale of the helicopter arranged by Paramount, there would have been no service provided by AAC."). On this record, we view the agreement of sale between AAC and Soundview Leasing as wholly irrelevant to the issue of whether the relationship between Paramount and AAC for servicing is governed by the U.C.C.

grocery store (Merritt Logan) against the manufacturer of the systems (Hussman), the dealer from whom the system was acquired (Fleming), and a firm which contracted to install the system (E & R). Merritt Logan sought recovery of economic losses only. One of Merritt Logan's claims against E & R was for negligent installation. We held as follows:

> The U.C.C. does not apply to E & R, which provided services and was not a seller of goods. Therefore, the U.C.C. does not preclude Merritt Logan's negligence claim against E & R.

*Id.* at 353 n. 1.

We also held that "E & R's contract with Fleming to install the system would, under New Jersey law, contain[a common law] implied warranty of good workmanship and ... Merritt Logan was a third party beneficiary of that contract." *Id.* at 369. We thus sustained a negligence recovery against E & R on a negligence theory despite the existence of a common law contractual remedy against it.

As noted, we are required to assume that ACC, like E & R, entered a contract to provide services. Its contractual relationship, like that of E & R, was not governed by the U.C.C. Even though ACC may have had contractual obligations with respect to the quality of those services, it, like E & R, may nevertheless be the subject of a negligence claim. As with E & R in *Merritt Logan*, *Spring Motors* does not preclude a negligence recovery against ACC in this case.

## IV. *SPRING MOTORS AND THE STRICT LIABILITY CLAIM*

■ *Spring Motors* and *Alloway* reflect a deference to legislative will where the

legislature has provided a comprehensive scheme controlling the relationship between the parties and, more specifically, a recognition of the importance of the allocation of risk of economic loss against the background of the rights and remedies provided by the U.C.C. As we have indicated, they make clear that as far as parties (whether commercial or non-commercial) within the distribution chain of goods are concerned, the U.C.C. alone controls the liability of a seller of goods for economic loss arising as a result of a defect in those goods; there is, accordingly, no liability in a tort action whether it be one asserting strict liability or negligence.

■ The situation before us differs from *Spring Motors* and *Alloway* in that Paramount is neither a purchaser in the distribution chain nor within the limited class of parties outside that chain who can fairly be said to be third party beneficiaries of transactions between parties in the chain of distribution. Accordingly, Paramount is not in a position to engage, directly or indirectly, in the risk allocation contemplated by the U.C.C. For this reason, we conclude that the Supreme Court of New Jersey would find *Spring Motors* and *Alloway* inapplicable to Paramount's strict liability claim against the Agusta defendants.

■ Under New Jersey's U.C.C., a seller of goods, absent disclaimer, impliedly warrants that its goods are merchantable to all foreseeable, subsequent buyers. *See Henry Heide, Inc. v. WRH Prods. Co.*, 766 F.2d 105, 110 (3d Cir.1985) (applying New Jersey law).[3] This implied warranty runs

---

**3.** N.J. Stat. Ann. § 12A:2–314 provides in relevant part:

> (1) Unless excluded or modified (12A:2–316), a warranty that the goods shall be merchantable is implied in a contract for

their sale if the seller is a merchant with respect to goods of that kind....

> (2) Goods to be merchantable must be at least such as

to, and is enforceable by, not only subsequent buyers, but also to those who subsequently acquire an interest less than fee title in the goods, as for example a lessee of the goods. *See Cintrone v. Hertz Truck Leasing & Rental Serv.*, 45 N.J. 434, 212 A.2d 769 (1965); *Damin Aviation Corp. v. Sikorsky Aircraft*, 705 F.Supp. 170 (S.D.N.Y.1989).[4] Thus, what is called "vertical privity" is not a requirement of a warranty claim under New Jersey U.C.C. law.

■■■ Section 12A:2–318 of New Jersey's U.C.C. provides for a limited extension of express and implied warranties to some persons who are not in the distribution chain. That section is entitled "Third Party Beneficiaries of Warranties Express and Implied" and provides in relevant part:

> A seller's warranty whether express or implied extends to any natural person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty.

N.J. Stat. Ann. § 12A:2–318. Thus, a natural person who is a member of the household or guest of a buyer and who receives personal injuries from the defective product, may recover for those injuries from a seller under the U.C.C. A seller cannot contract away the operation of this section, though it can limit its liability to third party beneficiaries by disclaimers in its agreements with its immediate purchaser. A member of the household or guest of a buyer in the chain of distribution is subject to the same defenses that would be available to the buyer.

Comment 3 of the U.C.C. speaks of Section 2–318 in the following terms:

> This section expressly includes as beneficiaries within its provisions the family, household, and guests of the purchaser. Beyond this, the section is neutral and is not intended to enlarge or restrict the developing case law on whether the seller's warranties, given to his buyer who resells, extend to other persons in the distributive chain.

*Id.* at cmt. 3. It is arguable that Section 2–318 was intended to provide the only situations in which parties not in the line of distribution are entitled to the benefits provided by New Jersey's version of the U.C.C. One can draw a negative inference from the reference to vertical privity in U.C.C. Comment 3 that only decisions on dispensing with the vertical privity requirement have been left to the courts. *See Article Two Warranties In Commercial Transactions: An Update*, 72 Cornell L.Rev. 1159, 1314 (1987) (characterizing this as the "better view"). Indeed, the only New Jersey court to directly rule upon the issue held that Section 2–318 is exclusive with respect to parties who are not in the distributive chain. *Monsanto Co. v. Alden Leeds, Inc.*, 130 N.J.Super. 245, 326 A.2d 90, 95 (1974).

> (a) pass without objection in the trade under the contract description; and
> (b) in the case of fungible goods, are of fair average quality within the description; and
> (c) are fit for the ordinary purposes for which such goods are used; and
> (d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

> (e) are adequately contained, packaged, and labeled as the agreement may require; and
> (f) conform to the promises or affirmations of fact made on the container or label if any.

4. The *Damin* case, relied upon by the District Court, is inapposite here because the plaintiff lessee of the helicopter was in the direct chain of distribution.

■ We do not predict, however, that the Supreme Court of New Jersey will find Section 2–318 to be the exclusive situation in which someone not in the distribution chain will be able to recover from a seller under the U.C.C. Indeed, the Supreme Court of New Jersey has permitted an employee of a firm which leases trucks to recover from the lessor of the trucks. *See Cintrone,* 212 A.2d at 781. We do, however, predict that one who has neither purchased nor leased a "good," but rather has been engaged to provide services to the owner of that "good" and who has suffered solely economic injury as a result of the malfunction of the good will not be entitled to recover from the manufacturer or other sellers in the distribution chain under New Jersey's U.C.C.

■ As we have noted, the U.C.C. provides a comprehensive scheme applicable to sellers and buyers of goods and the transactions between them. It provides presumed rights and remedies and then authorizes private reallocation of risks. The paradigm relationship within its scheme is that of a seller and its buyer who can negotiate with each other. As *Spring Motors* put it, "the Code generally applies to parties in privity." 489 A.2d at 674. While the New Jersey courts, as we have indicated, have dispensed with the requirement of privity in some situations, neither of the rationales used to extend the scope of the statute applies to the situation before us.

New Jersey courts dispense with vertical privity where the injured party is in the direct chain of distribution because a remote seller, by placing a product in that chain, impliedly represents to all who may buy it that it was merchantable when it left its possession. The theory is that subsequent buyers reasonably expect this to be the case and the remote seller can normally foresee the consequences of this

reliance by purchase. We predict that this theory would not be applied in New Jersey to excuse an absence of privity in an economic loss suit against a manufacturer or other seller in the distribution chain brought by a service provider who has not relied by purchase and whose utilization of, and reliance upon, the product are not necessarily that to be expected of a purchaser.

Nor can the rationale behind Section 2–318 be stretched to cover a product liability claim by a service provider against sellers in the distribution chain. While some parties who are not buyers or sellers can fairly be said to be the intended third party beneficiaries of transactions between buyers and sellers, no one has suggested a reason why such buyers and sellers would intend to confer a benefit on a service provider in their contracts of sale and purchase. In short, the third party beneficiary model simply does not fit.

Moreover, even if the New Jersey courts would be willing to extend the third party rationale to a service provider, we predict that they would find implicit in Section 2–318 a clearly expressed legislative policy choice limiting recovery by such third parties to damages for personal injuries.

Finally, *Spring Motors* and *Alloway* found that tort remedies would subvert the U.C.C.'s comprehensive scheme because it would deprive the parties of the ability to privately allocate the risk of economic loss. One in Paramount's position, of course, has no opportunity to negotiate with someone in CAGA's position or, indeed, with anyone else who seeks to convey an interest in goods and is subject to the presumptive rights and remedies of the U.C.C. While Paramount did, of course, negotiate with FSQ over the terms upon which its services were to be provided, that was not a negotiation covered by the U.C.C. and we believe the New Jersey courts would find

it unrealistic to expect that service providers are able to protect themselves from product defects through negotiation with the ultimate purchaser.

We thus conclude that New Jersey's version of the U.C.C. does not provide a comprehensive scheme intended to govern the product liability rights of Paramount against the Agusta defendants and that permitting it to proceed with its strict liability suit will not subvert the legislative scheme embodied in the U.C.C. *Spring Motors* and *Alloway* are, accordingly, inapposite.

## V. *RECOVERY OF ECONOMIC LOSS IN TORT*

To say that the teachings of *Spring Motors* and its progeny do not bar the negligence and strict liability claims here alleged by Paramount is not to say that the economic losses it allegedly suffered here are recoverable under the applicable New Jersey tort law. That issue has neither been decided by the District Court nor briefed by the parties before us. Accordingly, we do not resolve it. We comment only to make clear what remains to be decided on remand.

■ It is well established in New Jersey as elsewhere that "a defendant who negligently injures a plaintiff or his property may be liable for all proximately caused harm, including economic losses." *People Express Airlines, Inc. v. Consolidated Rail Corp.*, 100 N.J. 246, 495 A.2d 107, 109 (1985). In many, if not most jurisdictions, however, there is "a virtually per se rule barring recovery for economic loss unless the negligent conduct also caused physical harm." *Id.* This is not, however, the New Jersey rule.

In *People Express*, a fire occurred in Consolidated Rail's freight yard when ethylene oxide escaped from a tank car punctured during a "coupling" operation and ignited. As a result, the area within a mile radius of the yard was evacuated. This included the premises on which People Express's air freight operation was being conducted. It thus suffered substantial business interruption losses, for which it brought suit on a negligence theory against Consolidated Rail and others. People Express suffered no damages to its property. The New Jersey Supreme Court held as follows:

We hold therefore that a defendant owes a duty of care to take reasonable measures to avoid the risk of causing economic damages, aside from physical injury, to particular plaintiffs or plaintiffs comprising an identifiable class with respect to whom defendant knows or has reason to know are likely to suffer such damages from its conduct. A defendant failing to adhere to this duty of care may be found liable for such economic damages proximately caused by its breach of duty.

*Id.* at 116.

The *People Express* court went on to explain that both the issue of duty and the issue of proximate cause are affected by the degree to which injury to the particular plaintiff as well as the specific nature of the injury were reasonably foreseeable. It stressed, for example, that the "identifiable class of plaintiffs" referred to in its holding was "not simply a foreseeable class of plaintiffs," explaining:

For example, members of the general public, or invitees such as sales and service persons at a particular plaintiff's business premises, or persons travelling on a highway near the scene of a negligently-caused accident, such as the one at bar, who are delayed in the conduct of their affairs and suffer varied economic losses, are certainly a foreseeable class of plaintiffs. Yet their presence within

the area would be fortuitous, and the particular type of economic injury that could be suffered by such persons would be hopelessly unpredictable and not realistically foreseeable. Thus, the class itself would not be sufficiently ascertainable. An identifiable class of plaintiffs must be particularly foreseeable in terms of the type of persons or entities comprising the class, the certainty or predictability of their presence, the approximate numbers of those in the class, as well as the type of economic expectations disrupted.

*Id.* at 116.

The Court ultimately concluded that *People Express* had "set forth a cause of action ... and [was] entitled to have the matter proceed to a plenary trial." *Id.* at 118. It explained this conclusion in the following terms:

Among the facts that persuade us that a cause of action has been established is the close proximity of the North Terminal and People Express Airlines to the Conrail freight yard; the obvious nature of the plaintiff's operations and particular foreseeability of economic losses resulting from an accident and evacuation; the defendants' actual or constructive knowledge of the volatile properties of ethylene oxide; and the existence of an emergency response plan prepared by some of the defendants (alluded to in the course of oral argument), which apparently called for the nearby area to be evacuated to avoid the risk of harm in case of an explosion. We do not mean to suggest by our recitation of these facts that actual knowledge of the eventual economic losses is necessary to the cause of action; rather, particular foreseeability will suffice.

*Id.*

Following remand and the development of an appropriate record, the District Court should apply the teaching of *People Express* to the duty and proximate cause issues presented here.

Also left for resolution by the District Court is the issue of whether economic loss unaccompanied by personal injury or property damage is recoverable in New Jersey under a strict liability theory. Section 402A of the Restatement (Second) of Torts, which has been referred to on numerous occasions by the New Jersey courts with apparent approval, summarizes the law of strict product liability. It subjects a seller to liability only for "physical harm ... to the ultimate user or consumer, or to his property." On the other hand, the Supreme Court of New Jersey in *Santor v. A and M Karagheusian, Inc.* indicated that the manufacturer of a carpet could be held liable to a consumer for direct economic loss on a strict liability tort theory without regard to whether physical injury or damage to other property is involved. 207 A.2d at 312. While the specific holding of *Santor* may have little if any continuing viability after *Alloway*, the New Jersey Supreme Court may continue to find the rationale supporting this portion of the *Santor* decision persuasive.

The District Court should address on remand whether economic loss alone is ever recoverable under the strict liability law of New Jersey and, if so, whether the causal nexus between the defect and alleged losses here is too attenuated to permit recovery in strict liability here.

## VI.

The judgment of the District Court will be reversed and this matter will be remanded for further proceedings consistent with this opinion.