**CDE, INC., Plaintiff,**

**v.**

**SOURCE CAPITAL, INC., Defendant.**

**Civ. A. No. 74–63.**

United States District Court,
D. Delaware.

April 25, 1974.

Rodman Ward, Jr., of Prickett, Ward, Burt & Sanders, Wilmington, Del., Stephen M. Axinn, Henry P. Wasserstein, and Jonathan J. Lerner, of Skadden, Arps, Slate, Meagher & Flom, New York City, for plaintiff.

Andrew B. Kirkpatrick, Jr., Paul P. Welsh, and William H. Sudell, Jr., of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., Lawrence J. Sheehan and B. Boyd Hight, Jr., of O'Melveny & Myers, Los Angeles, Cal., for defendant.

## OPINION

STAPLETON, District Judge:

This is a declaratory judgment action seeking a determination of the rights of the parties under an agreement ("the Note Agreement") pursuant to which plaintiff's predecessor issued a $10,000,000 note ("the Note"). Plaintiff, CDE, Inc. ("CDE"), is a Connecticut corporation headquartered in New Jersey which is engaged in the operation of motion picture theatres. Defendant, Source Capital, Inc. ("Source"), is the original lender and present holder of the Note. Source is a diversified closed-end management investment company incorporated in Delaware and headquartered in California. CDE has moved for a preliminary injunction restraining Source from declaring the Note due and payable during the pendency of this action and for a ten day period following final judgment.

The history of this controversy begins in 1968. At that time, CDE's predecessor, Plume and Atwood Industries, Inc. ("P&A"), had recently become a majority-owned subsidiary of Cadence Industries Corporation ("Cadence"), a conglomerate. On December 31, 1968 P&A and Source entered into the Note Agreement. Pursuant to this agreement, Source tendered $10,000,000 in cash to P&A in exchange for which P&A issued to Source its 6% convertible subordinated note due December 31, 1988. The Note was convertible at Source's option at any time prior to 1988 into shares of P&A common stock at a conversion price of $33 a share. The provisions of the Note Agreement which lie at the heart of this controversy provide for certain alterations of this conversion right in the event of a reorganization, merger, or sale of assets, etc. by P&A or any successor of that corporation.

At the time the Note Agreement was executed the prime interest rate was 6¾%. P&A common stock was listed on the American Stock Exchange and was trading at $43⅞ per share. P&A had substantial senior debt to which the Note was subordinated, and under the terms of the Note Agreement the principal and interest on any subsequently incurred indebtedness would be senior debt unless by its terms it was made subordinate to any other indebtedness of the company.

By 1973 the prime interest rate had risen to approximately 10%. Concurrently, the market price of P&A common stock had sharply declined below the conversion price of $33 a share.

On March 23, 1973, Cadence made a cash tender offer to purchase all of the outstanding shares of P&A stock that it did not already own. As a result of this offer and subsequent additional purchases, Cadence became the owner of 92% of the outstanding P&A common stock. Cadence's offer stated that, if successful, P&A shares might fail to satisfy certain listing requirements of the American Stock Exchange and that, therefore, delisting was a possibility about which present P&A shareholders should be forewarned. On June 7, 1973 P&A stock was delisted.

On January 4, 1974, Cadence announced its intention to merge P&A into its wholly owned subsidiary, CDE. Minority shareholders of P&A, it stated, would receive $10 in cash for each share of P&A common stock that they owned.

On January 10, 1974, Source notified P&A that, since the shares of P&A common stock issuable on conversion of the Note had been delisted by the AMEX, it considered P&A to be in breach of Section 11.10 of the Note Agreement. Section 11.10 deals generally with P&A's obligation to maintain stock exchange listings of securities issuable upon conversion of the Note.

On January 18, 1974, P&A gave written notice to Source of its proposed merger into CDE and the effect of that merger on Source's conversion rights. According to that statement, upon exercise of those conversion rights Source would be entitled to cash in the ratio of $10, without interest, for each $33 of the Note's principal amount.

In February, 1974, the parties entered into negotiations about the alleged delisting default, the proposed merger of P&A into CDE and a possible settlement of the differences between the parties. During these negotiations counsel for Source informed counsel for P&A that Source would regard the proposed elimination of the right to convert the Note into shares of common stock and the substitution of cash in lieu thereof as a breach of the Note Agreement. Counsel for P&A advised that he understood Source's position in this regard. To assist these negotiations, it was agreed that Source would extend the grace period provided by the agreement for the curing of the breach alleged in the existing notice of default until March 2, 1974, and that P&A, for its part, would postpone its merger into CDE until March 1, 1974. These negotiations proved fruitless.

On March 1, 1974, a Certificate of Merger was filed merging P&A into CDE pursuant to Section 33–370 of the Connecticut Stock Corporation Act. Cadence had apparently earlier transferred its P&A stock to CDE and the merger was an "upstream" merger of a 90% owned subsidiary into its parent. Under Connecticut law this can be accomplished by a so-called short form merger without a stockholder vote and, in such a merger, the stock of the subsidiary can be converted into the right to receive cash. Under the Certificate, CDE assumed P&A's debt obligations. The Certificate further provided that upon the exercise of any conversion privilege by a holder of the Note, CDE would pay the holder $10 in cash for each share of P&A common stock to which the holder would have been entitled upon conversion immediately prior to the merger.

On March 8, 1974, Source sent CDE a second notice of default. This notice of default claimed that, by limiting Source to the receipt of cash upon the exercise of its conversion rights, CDE had violated Sections 11.5 and 11.6 of the Note Agreement.

Section 11.5 governs adjustment of the conversion privilege in the event of reorganizations, consolidations and mergers. Source maintains that these adjustment provisions are inconsistent with the claimed right of P&A to restrict the conversion right to cash. Section 11.6 provides, in part:

The Company will not, by amendment of its articles of incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Company, but will at all times in good faith assist in carrying out of all the provisions of this section 11 . . . .

Sections 19 and 20 of the Note Agreement provide, in part:

19. EVENTS OF DEFAULT; ACCELERATION. If any of the following events ("Events of Default") shall occur:

\* \* \* \* \* \*

(c) if the Company shall default in the performance of or compliance with any term contained herein, and such default shall not have been remedied within 30 days after written notice thereof shall have been given to the Company by any holder of any Note;

\* \* \* \* \* \*

then, and in any such event, any holder or holders of 51% or more in principal amount of the Notes at the time outstanding may at any time (unless all defaults shall have theretofore been remedied) at its or their option, by written notice or notices to the Company, declare all the Notes to be due and payable, whereupon the same shall forthwith mature and become due and payable together with interest accrued thereon, without presentment, demand, protest or notice, all of which are hereby waived.

20. REMEDIES ON DEFAULT, ETC. In case any one or more Events

of Default shall occur and be continuing, the holder of any Note at the time outstanding may proceed to protect and enforce the rights of such holder by an action at law, suit in equity or other appropriate proceeding, whether for the specific performance of any agreement contained herein or in such Note, or for an injunction against a violation of any of the terms hereof or thereof, or in aid of the exercise of any power granted hereby or thereby or by law. . . . If any holder of any Note shall give any notice or take any other action in respect of a claimed default, the Company will forthwith give written notice thereof to all other holders of the Notes at the time outstanding describing the notice or action and the nature of the claimed default. No source of dealing and no delay on the part of any holder of any Note in exercising any right, power or remedy shall operate as a waiver thereof or otherwise prejudice such holders' rights, powers and remedies. . . .

The complaint in this action was filed on April 1, 1974, twenty-three days after the dispatch of the second notice of default. By stipulation, the parties agreed to extend CDE's grace period for curing the second alleged default until seven days following this Court's ruling on CDE's application for temporary relief.

CDE now asks this Court, by the issuance of a preliminary injunction, to prohibit Source from declaring the Note due and payable prior to the expiration of a ten day period following a final declaratory judgment. As to the first notice of default, tendered on January 10, 1974, CDE concedes that the thirty day grace period has already expired and that an adverse declaratory judgment would render it immediately liable with no opportunity to cure.[1] CDE's application for equitable relief is thus directed at its second alleged default as to which the thirty day grace period has not yet expired. If this Court does not intervene to suspend this grace period until ten days after it renders a declaratory judgment, CDE claims it will be faced with an unappealing choice between the "Scylla" of effecting a "cure" in the next few days which it may not be legally obligated to effect and the "Charybdis" of assuming the risk of an adverse determination with no opportunity to cure. According to CDE, the first option would entail amending the Certificate of Merger to permit Source to convert into common stock of CDE.[2] This would, CDE asserts, be an irrevocable step and would deprive Cadence and CDE of the advantages of the parent and wholly owned subsidiary relationship which was the objective of the merger. Charybdis, on the other hand, offers, according to CDE, the prospect of having to pay $10,000,000 to Source which would not otherwise be payable until 1988 as well as other possible adverse consequences. "Repayment of the principal of the Note by CDE would trigger a default" on $5,000,000 in senior notes of CDE. Moreover, CDE maintains that "a genuine default not cured during the grace period could trigger defaults in some $13,000,000 in loans to Cadence."

CDE submits that the burden imposed by either course of action constitutes "irreparable injury" and that this injury, combined with the likelihood that it will prevail in its interpretation of the Note Agreement, is sufficient to entitle it to the equitable relief it seeks.

---

1. However, CDE contends (1) that the delisting did not constitute a default under the terms of the Note Agreement, (2) that Source waived this claim of breach by sending its second notice of default and (3) that, in any event, the AMEX delisting of P&A stock was mooted by P&A's merger into CDE.

2. CDE has represented to the Court that it stands ready to reserve for issuance to Source "a sufficient number of CDE shares to satisfy its claim of conversion in such manner as this Court may direct." I assume, without deciding, that CDE's proposed cure would be feasible and legally sufficient to cure the alleged default.

■ The purpose of preliminary injunctive relief is to preserve the court's power to render a meaningful and effective remedy after a full trial on the merits. As one commentator has explained:

> A court hearing a request for a preliminary order must determine how best to create or preserve a state of affairs such that it will be able, upon conclusion of the full trial, to render a meaningful decision for either party. Only the necessity of judicial intervention for the accomplishment of this purpose justifies imposing upon the defendant the burden of conforming to an order granted after a summary proceeding.

Note, Developments in the Law—Injunctions, 1965, 78 Harv.L.Rev. 994, 1056.

Here CDE seeks two alternative forms of ultimate relief: (1) a declaration that there has been no default, and (2) *in the event it is unsuccessful in obtaining that relief,* an injunction which would give CDE the opportunity to "cure" by prohibiting Source for a ten day period from declaring the Note due and payable. *Pendente lite* relief is not required to preserve the ability of this Court either to declare that there has been no default or to assure the plaintiff of the benefit of such a declaration.[3] Rather, preliminary relief is sought to prevent defendant from declaring the Note due and payable prior to judgment so that the second form of relief requested will be a viable alternative at the point of judgment. CDE will benefit from preliminary injunctive relief only if it loses on the declaratory judgment phase of its case but convinces the Court that, despite its default, it is entitled to the final injunction it seeks. Accordingly, the relevant "probability of success" question is whether, *assuming there has been a default,* CDE has shown any facts indicating its probable entitlement to relief from the contract clause giving Source the right of acceleration if an event of default remains uncured for more than thirty days.

The parties agree that the governing law is that of the State of New York. Two decisions of the highest court of that state provide helpful guidelines in analyzing the facts of this case and evaluating the probability of CDE's ultimate entitlement to relief from acceleration.

In Graf v. Hope Building Corporation, 254 N.Y. 1, 171 N.E. 884 (1930), the mortgage agreement before the court provided for acceleration of the date for payment of the principal in the event of a default for twenty days in the payment of any installment of interest. Through a clerical error in arithmetic and a subsequent failure of communication in the mortgagor's office, an interest payment was made of less than the amount due and the $401.87 (9%) shortage was not covered during the twenty day grace period. On the twenty-first day this mortgage foreclosure action was commenced. The mortgagor tendered performance and asked for equitable relief from the acceleration. In denying this relief the majority held as follows:

> . . . Plaintiffs may be ungenerous, but generosity is a voluntary attribute and cannot be enforced even by a chancellor. Forbearance is a quality which under the circumstances of this case is likewise free from coer-

---

3. Source has represented to the Court that, if not restrained, it will declare the Note due and payable and counterclaim for $10,000,000. In any event, it would be bound by the declaratory judgment. Any default in CDE's senior notes will only occur "upon payment of the Source Note." Accordingly, there should be no adverse consequence during the course of this suit, or thereafter, if this Court declares that there has been no default. While the Cadence notes present a somewhat different situation, CDE concedes that Cadence can defend any claims asserted thereunder on the ground that there has been no "genuine" default. Moreover, assuming potential injury to Cadence could support the relief which CDE seeks, the record fails to convince this Court that there is a real and immediate threat of any such claims being asserted against Cadence. The record would support a conclusion that such claims are a theoretical possibility. It suggests no more.

cion. Here there is no penalty, no forfeiture (Ferris v. Ferris, 28 Barb. 29; Noyes v. Anderson, 124 N.Y. 175, 180, 26 N.E. 316, 316, 21 Am.St.Rep. 657), nothing except a covenant fair on its face to which both parties willingly consented. It is neither oppressive nor unconscionable. Valentine v. Van Wagner, 37 Barb. 60. In the absence of some act by the mortgagee which a court of equity would be justified in considering unconscionable he is entitled to the benefit of the covenant. The contract is definite and no reason appears for its reformation by the courts. Abrams v. Thompson, 251 N.Y. 79, 86, 167 N.E. 178. We are not at liberty to revise while professing to construe. Sun Printing & Publishing Ass'n v. Remington Paper & Power Co., 235 N.Y. 338, 346, 139 N.E. 470. Defendant's mishap, caused by a succession of its errors and negligent omissions, is not of the nature requiring relief from its default. . . . Stability of contract obligations must not be undermined by judicial sympathy. To allow this judgment to stand would constitute an interference by this court between parties whose contract is clear. . . .

Judge Cardozo, joined by Judges Lehman and Kellogg, in dissent, would have granted equitable relief. The dissenting opinion, which has been commended by the leading authority in the field,[4] acknowledges that enforcement of an acceleration clause as written must be the general rule, but insists upon the power of a court of equity to grant relief in the extraordinary case. The analysis of the dissent looks not only to the conduct of the party seeking to enforce the acceleration clause but also to the reason for his opponent's default. Relief should have been granted, in the view of the dissent, because the default had been inadvertent and the circumstances suggested that the mortgagee had taken "unconscionable" advantage of his adversary. It is clear from Judge Cardozo's analysis, however, that the power of a court of equity to alter the terms of the parties' bargain must be sparingly exercised:

> There is neither purpose nor desire to impair the stability of the rule, which is still to be enforced as one of general application, that nonpayment of interest will accelerate the debt if the mortgage so provides. The rule is well understood, and is fair to borrower and lender in its normal operation. Especially is it fair if there is a period of grace (in this case twenty days) whereby a reasonable leeway is afforded to inadvertence and improvidence. In such circumstances, with one period of grace established by the covenant, only the most appealing equity will justify a court in transcending the allotted period and substituting another. There is a difference, however, between a denial of power, without heed to the hardship calling for its use, and a definition of hardship that will limit the occasions upon which power shall be exercised. . . . The exercise of a dispensing power was deemed to be a branch of the jurisdiction of equity to relieve against the consequences of accident or mistake. "This does not mean that such provisions for accelerating payments are provisions for forfeitures. Fairly made and fairly enforced they are not." Even so, "a court of equity may intervene to prevent the creditor from taking an unconscionable advantage of the letter of his bargain." [Citations omitted]

> When an advantage is unconscionable depends upon the circumstances. It is not unconscionable generally to insist that payment shall be made according to the letter of a contract. It may be unconscionable to insist upon adherence to the letter where the default is limited to a trifling balance, where the failure to pay the balance is the product of mistake, and where the mortgagee indicates by his conduct

4. Pomeroy, Equity Jurisprudence § 439, p. 220 (5th Ed. 1941).

that he appreciates the mistake and has attempted by silence and inaction to turn it to his own advantage.

.  .  .

In First National Stores v. Yellowstone Shopping Center, 21 N.Y.2d 630, 290 N.Y.S.2d 721 (1968) the principles applied in *Graf* were reexamined and applied by the Court of Appeals in a factual context somewhat closer to the one before this Court. The landlord plaintiff in that case had been directed by the fire department to install a sprinkler system in a portion of a shopping center leased by the defendant. A dispute ensued between the parties as to which of them was obligated to pay for the system. The lease provided that if the tenant defaulted in the performance of any covenant of the lease and the default continued for ten days after receipt of a notice of default, the landlord could declare the lease terminated. After some time had passed, notice of default was given. The tenant elected not to cure the alleged default and commenced a declaratory judgment action on the day following receipt of the notice. The tenant did not secure a preliminary injunction, however, until after the landlord had declared the term ended.

The Appellate Division construed the lease, sustained the landlord's construction, and determined that the tenant had defaulted. It granted relief from acceleration of the term, however, on the ground that the "tenant was acting in good faith when it brought the declaratory judgment action." The court gave the tenant twenty days to cure its default and enjoined the landlord from instituting proceedings to evict.

The Court of Appeals sustained the lower court's construction of the lease but reversed that portion of its degree granting relief from forfeiture. It held:

.  .  . [I]n a proper case, a court has the fullest liberty in molding its decree to the necessities of the occasion. But, it cannot grant equitable relief if there is no acceptable basis for doing so. Here, the lease had

been terminated in strict accordance with its terms. The tenant did not obtain a temporary restraining order until after the landlord acted. The temporary restraining order merely preserved the *status quo* as of the date it was obtained. Once the Appellate Division determined that the tenant had in fact defaulted by not installing the sprinkler system, the conclusion had to be drawn that the lease was terminated in accordance with its terms. The Appellate Division could not revive it unless it read into the lease a clause to the effect that the tenant could have an additional 20 days to cure is (sic) default before the landlord could commence summary eviction proceedings. This the court was powerless to do absent a showing of fraud, mutual mistake or other acceptable basis of reformation.

The sympathetic attitude of the majority below is understandable, but must be rejected. Article Twelfth of the lease, which gives the landlord the right to terminate after a 10-day notice of default, is neither harsh nor inequitable; a landlord's right to terminate a lease based upon a tenant's breach of his covenant is commonplace. In essence, this clause allowed the landlord to accelerate the term of the lease if the tenant failed, after notice, to cure his default. In an analogous situation involving the acceleration of the due date of the principal sum of a mortgage after a default for 20 days in the payment of the installment of interest, we said: "Rejection of plaintiffs' legal right could rest only on compassion for defendant's negligence. Such a tender emotion must be exerted, if at all, by the parties rather than by the court. Our guide must be the precedents prevailing since courts of equity were established in this state. *Stability of contract obligations must not be undermined by judicial sympathy*. To allow this judgment to stand would constitute an interference by this court between parties whose contract is clear"

(Graf v. Hope Bldg. Corp., 254 N.Y. 1, 4–5, 171 N.E. 884, 885, 70 A.L.R. 984 [emphasis added]; Weirfield Holding Corp. v. Pless & Seeman, 257 N.Y. 536, 178 N.E. 784).

Should we hold that the termination of this lease is harsh and inequitable, then the same conclusion can be reached in every instance where a landlord exercises his contractual rights, and, in that event, the right of termination or any other right specified in a lease would be rendered meaningless and ineffectual. . . .

It is possible to read these cases, as Source does, as establishing a New York rule that there can be no relief from a contract acceleration clause absent a ground for reformation or some act by the party seeking to enforce the clause "which a court of equity would be justified in considering unconscionable." This Court need not so conclude, however, in order to decide the matter before it. Even assuming the power to interfere extends to a wider range of cases, as the *Graf* dissent articulately argues, I am satisfied that the record in this case reveals no extraordinary equity in CDE's favor which would cause a New York court to depart from the general rule and the "stability of contract" policy which supports it.[5]

There is no allegation here that the default provisions of the Note or the limitation provisions of the grace period

were the result of fraud, duress or mistake. Nor is there any suggestion that the original negotiations were characterized by grossly unequal bargaining power. Accordingly, any ground for equitable relief from their operation must be found, it at all, in the facts surrounding the alleged default and defendant's response thereto.

Plaintiff's merger was a deliberate act taken by a corporation with the benefit of sophisticated counsel. Plaintiff was aware, prior to the implementation of the merger, that defendant objected to this action if it would purport to change the defendant's right to convert its Note for stock into a right of conversion into cash. While understandably no formal notice of default was served prior to the effective date of the merger, the uncontradicted affidavit of defendant's counsel states that he advised plaintiff's counsel of this position during their negotiations and the parties thereafter executed an agreement postponing the filing date of the merger certificate for a twenty day period so that efforts could be made to resolve the matter amicably. It is thus clear that plaintiff was aware of the potential claim of default prior to the implementation of the merger agreement. It undoubtedly examined the Note Agreement, evaluated its position, and decided to proceed. There was no default by oversight on plaintiff's part.

---

5. The lower court cases relied upon by plaintiff involve important considerations not present in this case and are thus of limited help to its cause here.

In 150 East 58th St. Associates v. Fletcher, 35 App.Div.2d 947, 316 N.Y.S.2d 644 (1970), the court enjoined the running of a grace period within which the lessee of real estate might cure a claimed default. One of the issues presented in the case was the "validity, clarity and specificity of the notice of default." The court there apparently was persuaded by the declaratory judgment plaintiff's argument that the notice was so vague that it deprived him of a fair opportunity to exercise his judgment as to whether there had been a default, and to cure the alleged default within the grace period in the event he decided not to assume the risk of acceleration. Our case raises no question

about the specificity of the notice of default. Here Source has not acted in any way which interferes with the ability of CDE either to make a judgment about the alleged default or to effect a cure within the bargained for period.

57 E. 54 Realty Corp. v. Gay Nineties Corp., 71 Misc.2d 353, 335 N.Y.S.2d 872 (1972) also involved termination of a lease. Because the lessor's course of performance had varied from a strict interpretation of his duties under the lease and the defendant-landlord had acquiesced in that performance his attempt to invoke the termination provisions of his lease was held unavailing. The court there characterized defendant's action as taken in "bad faith" and "verging on the unconscionable." As hereafter indicated, no such finding can be made in this case.

Turning to Source's position, I cannot say on this record that it has taken unfair advantage of CDE. Nothing in the record suggests an act or course of conduct on its part which might have led CDE to believe that Source would not insist upon its rights under the contract. Indeed, as previously noted, Source made its position clear prior to the merger. It did not mislead plaintiff or lull it to sleep in any way. Nor would there appear to be any unfairness in Source's conduct after the merger or in its present intention to declare the loan due and payable at the end of the grace period. The Source position with respect to the interpretation of the Note Agreement is clearly a litigable one. I am satisfied that it believes there has been a default. Moreover, the alleged default was not a breach of a collateral undertaking of P&A under the contract. Rather it was a default related to what was obviously an important part of the consideration to be paid to Source for the loan. While the convertibility feature has not as yet turned out to be as valuable as Source originally anticipated, one cannot say that the right to convert until 1988 is of so little value as to be *de minimis*.

Source does not deny that it desires to extricate itself from what is presently an unfavorable commitment, but this does not lead to the conclusion that Source has acted unconscionably. As Judge Cardozo observed in *Graf*, "it is not unconscionable generally to insist that payment shall be made according to the letter of a contract."

To the extent that the application for an extension of the grace period has appealed in this case it is solely because

CDE's obligations under the Note Agreement are not altogether clear [6] and, at this point, it cannot secure a final judicial declaration regarding those obligations prior to the expiration of the grace period.[7] Yet, this was precisely the position of the tenant in the *First National* case. It is apparent from the opinion in that case that the tenant's position was a litigable one; in fact, the court found that he had instituted his declaratory judgment action in "good faith." The ten day grace period did not provide sufficient time for him to secure a judicial determination of his rights. The court nevertheless held that he had bargained for a ten day period in which to cure any default and that a court of equity would not extend the period for cure.

It is true that the court in the *First National* case pointed out that the tenant had not secured preliminary relief prior to the end of the grace period and the landlord's termination declaration. I cannot, however, accept CDE's argument that the court meant to indicate that the result would have been different if the tenant had earlier secured a preliminary injunction and that the case, accordingly, supports CDE's right to a preliminary injunction. While the *First National* court used language which might be taken to suggest that, in the absence of grounds for reformation of the contract, a court of equity loses power to grant relief from an acceleration clause after the acceleration has taken place, it is difficult to attribute such a view to the court in light of the New York case law on the subject. It is clear from a study of earlier Court of Appeals cases that relief can be granted

---

6. By finding that CDE's position with respect to the declaratory judgment phase of its case is litigable, I do not thereby find that it has demonstrated a probability of success in the declaratory judgment phase of its case. Under the view I take of this matter, that question is not relevant.

7. Source argues that CDE would, and should, have instituted its declaratory judgment action before implementing the merger. See Diebold Computer Leasing v. Commercial

Credit Corporation, 267 A.2d 586 (Del. Supr.Ct.1970). In this way, it is suggested, CDE clearly had it within its power to maintain the true status quo pending judicial resolution of the differences between the parties. Having altered the status quo before appealing to the court, as the argument does, it has created its own "crisis." While this analysis has considerable appeal, I believe the New York cases make it unnecessary for this Court to pass upon it.

after acceleration where there is estoppel, bad faith, fraud, oppression or unconscionable conduct on the part of the party seeking to enforce the clause.[8] The holding of the court in the *First National* case rests not on the time sequence of the judicial proceedings but rather on the clearly expressed view of the court that the policy favoring stability of contracts entitled the landlord to declare acceleration in accordance with the terms of the contract, despite the fact that the tenant asserted, in good faith, that no default had occurred.

Preliminary relief may, of course, be granted in cases arising in the same procedural context as the *First National* case, but in order for that relief to be appropriate, it is necessary that the traditional prerequisites be met. One of those prerequisites—a probability of ultimate success—cannot be evaluated without reference to the substantive law principles upon which the court relied in *First National*. Surely, so long as *First National* states the law of New York, a party in a position identical to that of the tenant in that case could not, during the course of a grace period, secure a preliminary injunction prohibiting a termination declaration pending a declaratory judgment. He simply could show no probability of ultimately securing an order extending the grace period he had agreed upon.

 I can see no material distinction between CDE's position here and that of the tenant in *First National*. It makes little difference whether the party allegedly in default seeks an extension of the grace period before or after its expiration. In either case, he asks the court to relieve him of the adverse consequence his contract has designated in the event he declines to cure within the prescribed period and, instead, litigates unsuccessfully. In *First National*, as here, the contract has squarely placed the risk of acceleration on the party who stands on his interpretation of his contract obligations and is ultimately proven wrong. If that party can show no equity entitling him to relief from his contract, it hardly matters whether, as here, he seeks a preliminary injunction before acceleration or, as in *First National*, he asks for an opportunity to cure after acceleration has occured.

Based upon the holding in the *First National* case, I conclude that CDE would be unable to secure preliminary injunctive relief in a New York court and thus is entitled to none here. The application for a preliminary injunction will be denied.

---

8. See *e. g.*, Ferlazzo v. Riley, 278 N.Y. 289, 16 N.E.2d 286 (Ct.App.1938) ; Noyes v. Clark, 7 Paige 179, 32 Am.Dec. 620 (N.Y. Ch.1838) ; Broderick v. Smith, 26 Barb. 539 (N.Y.Sup.Ct.1858) ; Noyes v. Anderson, 124 N.Y. 175, 26 N.E. 316 (Ct.Apps.1891).