FLEMING COMPANIES, INC., Plaintiff,

v.

THRIFTWAY MEDFORD LAKES, INC.,
d/b/a Murphy's Market, Defendant.

Ronald S. MURPHY, Kathleen Murphy,
and Thriftway Medford Lakes, Inc.,
Plaintiffs,

v.

FLEMING COMPANIES, INC., G. William Watson, John R. Traub and
Wayne Pendergast, Defendants.

Civil Action No. 93–2103 (MLP).

United States District Court,
D. New Jersey.

March 3, 1995.

Craig S. Hilliard, Stark & Stark, Princeton, New Jersey, Michael J. McCaney, Jr., Heller, Kapustin, Gershman & Vogel, Plymouth Meeting, Pennsylvania, for Fleming Companies, Inc., G. William Watson, John R. Traub and Wayne Pendergast.

Patrick F. McAndrew, Brandt, Haughey, Penberthy, Lewis & Hyland, P.A., Moorestown, New Jersey, John J. Pribish, North Brunswick, New Jersey, for Ronald S. Murphy, Kathleen Murphy and Thriftway Medford Lakes, Inc.

### MEMORANDUM AND ORDER

PARELL, District Judge.

This matter is before the Court on motion for summary judgment by Fleming Companies, Inc., G. William Watson, John R. Traub, and Wayne Pendergast. For the following reasons, the motion is granted.

### FACTUAL BACKGROUND

This case involves a business relationship that was formed in the Spring of 1978 for the purpose of opening and operating a supermarket in Medford Lakes, New Jersey. The relevant facts ascertained from the record are as follows:

Ronald Murphy ("Murphy") is an individual with a high school education who has worked in the grocery or supermarket business since he was approximately twelve or thirteen years old. In 1977, while Murphy was employed as a manager at a Shop N' Bag supermarket in Glenn Oaks, New Jersey, he mentioned to a representative from Fleming Companies, Inc. ("Fleming"), who was at the Shop N' Bag store, that he would be interested in becoming an "equity store" owner. Thereafter, Fleming proposed to Murphy that he seek to participate in a program sponsored by Fleming known as the "Equity Plan." The Equity Plan is a program whereby Fleming provides individuals who show promise and who would otherwise

be financially unable to do so, with the opportunity to become owners and operators of a supermarket.[1]

A store site in Medford Lakes, New Jersey was mutually agreed upon by Fleming and Murphy, and thereafter Fleming provided Murphy with a book (the "Equity Plan Book") explaining in general terms how the Equity Plan works. Murphy states that he read this book but that he did not understand the principles and procedures which are set forth therein. The Equity Plan Book provides:

> After you have been approved for an Equity Store, you are expected to enter into a "Participation Agreement," that spells out, in the greatest detail, every single step in the development and operation of both an Equity Corporation and an Equity Store.

> Because the Participation Agreement is a lengthy, legal document, we do not expect you to understand it on a single reading. We want you to take it home and study it at your leisure. If you wish, you may discuss it with such people as your attorney, banker, accountant, etc., and, by all means, we urge you to go over it with your wife.

(Defs.' App. at 30a.)

Murphy states that he did not consult with an attorney or seek the advice of any other type of professional regarding the principles and procedures set forth in the Equity Plan Book because he "took for granted that everything was the way it should be" and because he is "an uneducated person" and "didn't want to make a fool of [him]self asking stupid questions." (Defs.' App. at 218–19a.)

Murphy was approved by Fleming as an Equity Store operator for the Medford Lakes location. On April 24, 1978, Murphy met with a representative from Fleming and, at that time, he signed a number of Equity Plan agreements prepared by Fleming, including a lease agreement whereby Fleming subleased the Medford Lakes property to Thriftway Medford Lakes, Inc. ("TML"), the Equity Corporation which was formed as part of the Equity Plan program. Prior to signing these agreements, Murphy did not consult with an attorney or seek the advice of any other type of professional regarding the nature and the extent of the obligations and the rights set forth in these agreements because he did not feel that it was necessary to do so. (Defs.' App. at 229a.) Murphy concedes that neither Fleming nor any representative of Fleming prevented Murphy from asking questions or from seeking outside counsel or advice.

In April of 1978, the Medford Lakes property was owned by Floharon Properties, Inc. ("Floharon"). On April 24, 1978, Fleming entered into an agreement (the "Build and Lease Agreement") with Floharon to lease the Medford Lakes property. The Build and Lease Agreement provides:

> The LESSOR [Floharon] agrees to, and does hereby, lease the premises to the LESSEE [Fleming] for an original term of twenty (20) years, commencing on the first day the premises is open for business.
> . . . .

> . . . . . .

> It is further agreed that, at the expiration of the original term, the LESSEE shall have the right, exercisable at its sole option to extend this lease for three (3) additional term(s) of five (5) years each, upon the same terms and conditions.

(Defs.' App. at 67–68a.)

The Sublease Agreement between Fleming and TML provides:

> Equity Plan is designed to enable the operator to eventually obtain full ownership and control of the Equity Corporation by providing that, over time, the Equity Corporation is to pay off the loan made by Fleming and retire Fleming's shares of stock in the Equity Corporation. Once the Equity Corporation pays off Fleming's loan in full and retires all of Fleming's stock, Fleming no longer has an interest in the Equity Corporation and no longer retains the right to appoint any of the directors of the Equity Corporation.

---

1. Under the Equity Plan, an "Equity Corporation" is created for the purpose of operating a supermarket. Under the Equity Plan, the operator of the supermarket, who is Murphy here, invests approximately $50,000.00 and Fleming invests all other funds necessary to get the supermarket up and running. In consideration for the monies which Fleming invests, it receives a debenture note, shares of stock in the Equity Corporation and the right to appoint three of the five director seats in the Equity Corporation. The

SUBLESSOR [Fleming] hereby leases to SUBLESSEE [TML], and SUBLESSEE hires from SUBLESSOR, only for operation of a retail food market, the premises as above described, for an initial term of five (5) years, commencing simultaneously with the term of the ORIGINAL LEASE [between Floharon and Fleming].

This Sublease shall be automatically renewed for three (3) additional terms of five (5) years each unless SUBLESSOR terminates this Sublease by giving written notice to SUBLESSEE ninety (90) days prior to the end of the initial term or any additional term. Notwithstanding any such renewal, or any other provision hereof, this Sublease shall terminate on the expiration or termination of the ORIGINAL LEASE. SUBLESSEE shall be subject to all the terms and conditions of the ORIGINAL LEASE. Such ORIGINAL LEASE is for a term of twenty (20) years.

(Defs.' App. at 47–48a.)

In 1983, Murphy paid off Fleming's interest in TML, the Equity Corporation, and Murphy thereby assumed full ownership and control of TML. TML continued to be a sublessee of Fleming under the Sublease Agreement and TML continued to purchase groceries and certain other services from Fleming.

In 1987, TML purchased from Floharon the fee interest in the land upon which the Medford Lakes supermarket is situated. TML secured financing from a bank in order to make this purchase. Fleming provided TML with a bridge loan of $500,000.00 until the permanent financing was in place.[2]

In 1989, TML terminated its relationship with Fleming as a supplier of groceries and other products. TML also changed the name of the supermarket to "Murphy's Market" and thereafter ceased to use the trade name "Thriftway." [3]

By letter dated January 18, 1993, Fleming notified TML that it was exercising its right to terminate the Sublease Agreement as of April 30, 1993, the date on which the current term would end, and that it would not renew the Sublease Agreement for an additional five year term. TML refused to vacate the premises and, on May 4, 1993, Fleming filed a diversity action with this Court seeking to eject TML and to recover damages for mesne profits.

On May 24, 1993, Ronald Murphy, Kathleen Murphy, and TML filed an action in New Jersey state court against Fleming Companies, Inc., G. William Watson, John R. Traub and Wayne Pendergast[4] asserting (1) breach of fiduciary duty, (2) breach of the implied duties of good faith and fair dealing, (3) gross negligence, (4) fraud and conspiracy, (5) general estoppel, and (6) violations of (a) the New Jersey Franchise Act, N.J.Stat. Ann. 56:10–1 et seq., (b) the New Jersey Anti–Trust Act, N.J.Stat.Ann. 56:9–1 et seq., (c) the New Jersey Uniform Securities Law, N.J.Stat.Ann. 49:3–47 et seq., (d) the New Jersey Consumer Fraud Act, N.J.Stat.Ann. 56:8–1 et seq., and (e) the New Jersey Business Corporation Act, N.J.Stat.Ann. 14A:1–1 et seq.. On June 17, 1993, the state court action filed by the Murphys and TML was removed to this Court on the basis of diversity jurisdiction and, by Consent Order dated August 17, 1993, was thereafter consolidated with the initial action filed by Fleming.

Fleming Companies, Inc., G. William Watson, John R. Traub and Wayne Pendergast (hereinafter the "Fleming defendants" unless otherwise indicated) move for summary judgment as to all claims asserted against them by the Murphys and TML. Fleming further

2. Although neither the Murphys or TML were parties to the Build and Lease Agreement when it was executed in April of 1978, when the Murphys purchased the fee interest in 1987, they assumed Floharon's position as lessor under the Build and Lease Agreement. Nevertheless, although the Murphys thereafter owned the fee interest, Fleming retained its rights as the lessee of the property under the Build and Lease Agreement.

3. "Thriftway" is the trade name owned by Fleming.

4. G. William Watson, John R. Traub and Wayne Pendergast (the "individual defendants") are former directors and officers of TML who had been appointed by Fleming prior to 1983, the year when Murphy paid off Fleming's interest in TML. After 1983, the individual defendants ceased to be directors and/or officers of TML.

moves for summary judgment on its claim against TML for ejectment and damages for mesne profits. On September 22, 1994, this Court heard the oral arguments of counsel on this motion for summary judgment.

## DISCUSSION

A court shall enter summary judgment under Federal Rule of Civil Procedure 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In order to defeat a motion for summary judgment, the opposing party must establish that a genuine issue of material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Township*, 772 F.2d 1103, 1109 (3d Cir.1985), *cert. denied*, 475 U.S. 1013, 106 S.Ct. 1190, 89 L.Ed.2d 305 (1986). A nonmoving party may not rely on mere allegations; it must present actual evidence that creates a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986) (citing *First Nat'l Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968)); *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir.1990). Issues of fact are genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. at 2510.

■ The event which is the catalyst of this entire litigation is the decision by Fleming not to renew the Sublease Agreement for an additional five year term and the ensuing action for ejectment filed by Fleming based on its asserted right to occupy the store premises in Medford Lakes, New Jersey (hereinafter the "premises").

Initially, the Court addresses the contention by the Murphys and TML that the term provisions of the Build and Lease Agreement and the Sublease Agreement are ambiguous and, therefore, should not be enforced. The Murphys state that they always understood that the term of the Sublease Agreement was the same as the term of the Build and Lease Agreement. However, regardless of what the Murphys subjectively understood these terms to mean, the terms are not ambiguous.

By its plain language, the Build and Lease Agreement is for an original term of twenty years and Fleming clearly has the right, exercisable at its sole option, to extend this lease upon the same terms and conditions for up to three additional terms of five years each. Thus, it is clear that Fleming has a right under the Build and Lease Agreement, at its option, to occupy the premises for up to thirty five years.

By its plain language, the Sublease Agreement is for an initial term of five years and this initial five year period is to commence running simultaneously with the commencement of the running of the Build and Lease Agreement. The Sublease Agreement is automatically renewed at the end of the initial five year term for up to three additional terms of five years each *unless* Fleming terminates the Sublease Agreement by providing written notice to TML ninety days prior to the end of the initial term or any additional term.

By the terms of the Sublease Agreement, TML, as Fleming's sublessee, had the right to occupy the premises for up to twenty years unless Fleming terminated the Sublease Agreement earlier by providing TML with the appropriate notice. By letter dated January 18, 1993, Fleming provided TML with notice that it was terminating the Sublease Agreement, effective as of April 30, 1993, the date on which the current term was to end. By the terms of the Sublease Agreement, this was sufficient notice of termination. Thus, as of April 30, 1993, Fleming had the right to occupy the premises as lessee under the Build and Lease Agreement.

■ Parties are generally free to contract as they desire and, absent mistake, fraud, duress, unconscionability, or illegality, parties are bound by the unambiguous terms of their contract. *See Brokers Title Co., Inc. v. St. Paul Fire and Marine Ins. Co.*, 610 F.2d 1174 (3d Cir.1979); *Vasquez v. Glassboro Service Ass'n, Inc.*, 83 N.J. 86, 101–102, 415 A.2d 1156, 1164 (1980). Moreover, it is

well settled that affixing a signature to a contract creates a conclusive presumption that the signer read, understood, and assented to its terms. *Fivey v. Pennsylvania R.R. Co.,* 67 N.J.L. 627, 632, 52 A. 472, 473 (E. & A.1902); *Wade v. Park View, Inc.,* 25 N.J.Super. 433, 439–40, 96 A.2d 450, 453 (Law Div.), *aff'd,* 27 N.J.Super. 469, 99 A.2d 589 (App. Div.1953). Furthermore, the stability of contract obligations cannot be undermined by judicial sympathy and courts should not interfere between parties where the terms of the parties' contract are clear. *CDE, Inc. v. Source Capital, Inc.,* 374 F.Supp. 1019, 1024 (D.Del.1974).

Thus, unless it is shown that there is mistake, fraud, duress, unconscionability, or illegality here, the unambiguous terms of the lease agreements are binding. The Murphys and TML have asserted a variety of claims against the Fleming defendants whereby they seek to avoid the effect and/or enforcement of the terms of the lease agreements.

The Murphys state that they have always believed that the term of the Sublease Agreement was the same as the term of the Build and Lease Agreement. However, as previously discussed, this is not what the unambiguous language of these leases provides. Thus, if anything, a unilateral mistake was made by the Murphys. *See Santamaria v. Shell Eastern Petroleum Products, Inc.,* 116 N.J.Eq. 26, 29, 172 A. 339, 341 (1934).

■ It is well established that in order to rescind or reform an agreement on the basis of a unilateral mistake, the following essential elements must each be present: (1) the mistake must be of so great a consequence that to enforce the contract as actually made would be unconscionable; (2) the matter as to which the mistake was made must relate to the material feature of the contract; (3) the mistake must have occurred notwithstanding the exercise of reasonable care by the party making the mistake, and (4) the relief afforded must not seriously prejudice the other party, except for loss of his bargain. *Conduit & Foundation Corp. v. Atlantic City,* 2 N.J.Super. 433, 64 A.2d 382, 385–86 (Ch.Div.1949); *see also Brookside Enterprises, Inc. v. Baum,* 1994 WL 715645 (D.N.J. Dec. 19, 1994). Negligence is de-fined as the failure to exercise reasonable care under the circumstances. Thus, since a mistaken party must have exercised reasonable care under the circumstances before the party may obtain rescission or reformation, where the mistake is the result of the mistaken party's own negligence such remedies are unavailable. *Moro v. Pulone,* 140 N.J.Eq. 25, 52 A.2d 818, 821 (Ch.Div.1947) (citing *Harrington v. Heder,* 109 N.J.Eq. 528, 534, 158 A. 496 (E. & A.1932)).

■ Prior to executing the various agreements on behalf of TML, Murphy chose not to consult an attorney or to obtain any other type of professional advice regarding the principles and procedures set forth in the Equity Plan Book or regarding the nature and effect of the obligations and rights set forth in the various agreements at issue, including the Sublease Agreement and the Build and Lease Agreement which is referenced in the Sublease Agreement. As Murphy himself stated, he elected not to seek any such outside counsel because he "took for granted that everything was the way it should be" and that because he felt that such measures were not "necessary." The Court concludes that an ordinarily reasonable person in Murphy's position would have sought independent professional advice before entering into these admittedly complicated and detailed commercial agreements, especially when it is admitted that the person does not understand the nature and effect of the obligations and rights set forth in such agreements. *See Asbestos Fibres, Inc. v. Martin Lab., Inc.,* 12 N.J. 233, 244, 96 A.2d 395, 401 (1953).

■ Thus, any mistaken belief held by the Murphys as to the nature and effect of the term provisions of the lease agreements is due to their own negligence. Moreover, to grant rescission or reformation, a court must be able to return the parties to their original position. *See Notch View Assoc. v. Smith,* 260 N.J.Super. 190, 615 A.2d 676, 679–80 (Law Div.1992) (citations omitted). Further, the remedies of rescission and reformation are discretionary and where a party has not acted within a reasonable time or where there has been substantial performance,

these remedies are not available. *Id.* As such, there is no basis upon which to rescind or reform the lease agreements on the basis of a unilateral mistake.

The Murphys and TML assert that the Fleming defendants fraudulently and intentionally, and in conspiracy, by remaining silent as to the true nature and effect of the terms of the lease agreements, made misrepresentations to the Murphys and TML and led them to believe that the term of the Sublease Agreement was the same as the term of the Build and Lease Agreement. Specifically, the Murphys and TML allege that the Fleming defendants, by their silence, made fraudulent misrepresentations when they "allowed" the Murphys to purchase the fee interest in the premises in 1987 and when they "allowed" the Murphys to spend substantial money improving and renovating the premises beginning in 1989. The Murphys and TML assert that these misrepresentations have ultimately resulted in their detriment.

■ Under New Jersey law, the essential elements of fraud are (1) a material representation pertaining to a presently existing or past fact; (2) made with knowledge of the falsity of the representation and with an intention that the other party rely on the representation; and, (3) justifiable reliance on the representation which results in actual damage. *Jewish Center of Sussex County v. Whale*, 86 N.J. 619, 432 A.2d 521 (1981); *Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 189 N.J.Super. 347, 460 A.2d 161 (App. Div.1983), *rev'd on other grounds*, 97 N.J. 37, 477 A.2d 1224 (1984).

■ One of the essential elements of a cause of action for fraud is reliance and a plaintiff must demonstrate that reliance upon any representation was justified and reasonable. *Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 460 A.2d at 165. "A party in possession of his mental faculties is not justified in relying on representations made, when he

has ample opportunity to ascertain the truth of the representations before he acts. When he is afforded the opportunity of knowing the truth of the representations, he is charged with knowledge. If one does not avail himself of the means of knowledge open to him, he cannot be heard to say he was deceived by misrepresentations." *Id.; see also Int'l Minerals & Mining Corp. v. Citicorp North America, Inc.*, 736 F.Supp. 587, 597–99 (D.N.J.1990); *Jewish Center of Sussex County v. Whale*, 86 N.J. 619, 432 A.2d 521 (1981).

■ As previously discussed *supra*, prior to executing the various agreements on behalf of TML, Murphy chose not to consult an attorney or to obtain any other type of professional advice regarding the principles and procedures set forth in the Equity Plan Book or regarding the nature and effect of the obligations and rights set forth in the various agreements at issue for the stated reason that he assumed that "everything was the way it should be" and that such measures were not "necessary." Further, in the approximate fifteen year period since these agreements were executed and this litigation was instituted, the Murphys never consulted with an attorney nor had any of the various agreements reviewed by an attorney. They did not consult an attorney or have the agreements reviewed before they chose to buy out Fleming's interest in TML or before they chose to purchase the fee interest in the premises from Floharon or before they chose to cease doing business with Fleming altogether or before they chose to make costly improvements to the premises.[5] The Murphys were not discouraged or prevented from having the various agreements reviewed by an attorney who presumably would have advised them of the nature and effect of the terms contained therein.

Thus, even assuming that the Fleming defendants, by their silence, in some way misrepresented to the Murphys the nature or effect of the relevant term provisions of the

---

5. Further, a party who makes improvements to property, based upon the mistaken belief of right of possession or ownership of the property, the party cannot recover the value of the improvements where the mistake is the result of the party's own negligence. *See Riggle v. Skill*, 9

N.J.Super. 372, 379, 74 A.2d 424, 427 (Ch.Div. 1950) *aff'd*, 7 N.J. 268, 81 A.2d 364 (1951); *Township of Brick, Ocean County v. Vannell*, 55 N.J.Super. 583, 593–94, 151 A.2d 404, 409–10 (App.Div.1959).

leases, the Murphys' reliance on any such representations was not justified or reasonable since they had ample opportunity to ascertain the truth of any such representations and ample opportunity to ascertain the true nature and effect of the term provisions of the leases. At this point, the Murphys cannot be heard to say they were deceived by any such representations concerning the effective terms of the leases. *Nappe v. Anschelewitz, Barr, Ansell & Bonello,* 460 A.2d at 165; *see Moreira Construction Co. v. Moretrench Corp.,* 97 N.J.Super. 391, 235 A.2d 211, 213 (App.Div.1967), *aff'd,* 51 N.J. 405, 241 A.2d 236 (1968).

▮ The Murphys and TML allege that the actions of the Fleming defendants are unconscionable. Unconscionability is a question of law to be determined by the court. *Monsanto Co. v. Alden Leeds, Inc.,* 130 N.J.Super. 245, 253, 326 A.2d 90 (Law Div.1974). Where no genuine issue of material fact exists, a court may conclude on a motion for summary judgment that a contract is enforceable despite an allegation of unconscionability. *Stanley A. Klopp, Inc. v. John Deere Co.,* 510 F.Supp. 807, 810 (E.D.Pa.1981), *aff'd,* 676 F.2d 688 (3d Cir. 1982).

▮ Unconscionability exists where "grossly disproportionate bargaining power" between the parties has resulted in "grossly unfair contractual provisions." *Jefferson Loan Co., Inc. v. Livesay,* 175 N.J.Super. 470, 479, 419 A.2d 1164, 1169 (1980) (quoting *Shell Oil Co. v. Marinello,* 63 N.J. 402, 408, 307 A.2d 598, 601 (1973), *cert. denied,* 415 U.S. 920, 94 S.Ct. 1421, 39 L.Ed.2d 475 (1974)). Even where there is unequal bargaining power between parties, that alone is not "the decisive consideration." *Monsanto Co. v. Alden Leeds, Inc.,* 326 A.2d at 98. "The effect of the unconscionability rule is not designed to upset the terms of a contract resulting from superior bargaining strength, but to prevent oppression and unfair surprise." *Jefferson Loan Co., Inc. v. Livesay,* 419 A.2d at 1169 (citation omitted). Furthermore, the fairness of a bargain is to be judged as of the time of its making. *Standard Oil Co. of Tex. v. Lopeno Gas Co.,* 240 F.2d 504, 509 (5th Cir.1957). Specific performance of a contract, fair when made, will not necessarily be denied because it has become a hard bargain through subsequent events and changed conditions, and it would be error to refuse to grant a decree of specific performance in the absence of circumstances indicating fraud or bad faith. *Id.* (citing 49 Am.Jur., Specific Performance, § 49); *see also Sinclair Refining Co. v. Miller,* 106 F.Supp. 881, 885–886 (D.Neb.1952).

▮ This Court concludes that there is no unconscionability here. Even assuming that Fleming was in the superior bargaining position, the challenged contract provisions were not grossly unfair at the time these lease agreements were entered into by the parties in 1978. Further, there is no evidence of oppression or unfair surprise. While it is entirely possible that Murphy would have successfully negotiated a different sublease term if he had to do it over again, the law of contracts does not act as an insurance policy for parties who later suffer some sort of loss as the result of an undesirable contractual term. The freedom to contract includes the freedom to enter into good or bad deals.

Moreover, the Sublease Agreement does not require that Fleming have cause to terminate. Therefore, even if Fleming chose not to renew the Sublease Agreement for the reason that TML had ceased to do business with it, Fleming was merely exercising the rights provided to it under the Sublease Agreement and was in no way acting unlawfully.[6] Had TML not chosen to cease doing business with Fleming and to discontinue using the "Thriftway" trade name, then Fleming may not have exercised its right not to renew the Sublease Agreement; however, this consideration is not material to the outcome of this litigation.

▮ The Murphys and TML also claim that the agreements are void or voidable due to breach of fiduciary duties by the Fleming

---

6. Insofar as the Murphys and TML assert that Fleming must have "good cause" to terminate the Sublease pursuant to the New Jersey Fran-chise Act, N.J.Stat.Ann. 56:10–1 *et seq.,* see discussion *infra.*

defendants.[7] The basis of these claims is that Fleming and the individual defendants, as appointed directors of the Board of Directors of TML, caused the Murphys and TML to enter into transactions which were in the best interest of Fleming but against the best interests of the Murphys and TML.

Any breach of fiduciary duty here must have occurred prior to or during 1983 since the Murphys obtained full ownership and control of TML in 1983 and since thereafter the individual defendants ceased to hold any position as an officer or director of TML. Thus, even assuming arguendo that a cognizable claim or claims for breach of fiduciary duty has been asserted here, any such claim is barred by the statute of limitations.

■■■ A claim for breach of fiduciary duty, which has a six year statute of limitations, commences to run at the point the plaintiff has actual or constructive knowledge of the breach. *Zola v. Gordon*, 685 F.Supp. 354, 374 (S.D.N.Y.1988). A plaintiff has actual or constructive knowledge of a cause of action for breach of fiduciary duty when the plaintiff learns, or reasonably should learn, of the existence of the state of facts which may equate in law with the cause of action. *Burd v. New Jersey Tel. Co.*, 76 N.J. 284, 386 A.2d 1310, 1314 (1978).

Ever since 1983, the year that the Murphys became the sole shareholders of TML, the corporate records have been maintained in their custody. These records memorialize the transactions which the Murphys and TML now seek to challenge.[8] Thus, the Murphys and TML reasonably should have known at least by 1983 of the state of facts which they allege as a basis for asserting the various breaches of fiduciary duty here. Accordingly, the claims by the Murphys and TML for breach of fiduciary duty are barred by the six year statute of limitations. *See Amland Properties Corp. v. Aluminum Co. of America*, 808 F.Supp. 1187, 1192–93 (D.N.J.1992); *Tevis v. Tevis*, 79 N.J. 422, 400 A.2d 1189, 1195 (1979) (discovery rule applicable only in those circumstances where a plaintiff reasonably could not have been aware of the underlying factual basis for a cause of action).[9]

■■■ The Murphys and TML allege that the Fleming defendants breached the implied duties of good faith and fair dealing. Implicit in every contract there is a covenant of good faith and fair dealing. Initially, the Court notes that the six year statute of limitations set forth by N.J.Stat.Ann. 2A:14—1 applies to claims for breach of contract. *See Lavin v. Board of Educ. of City of Hackensack*, 90 N.J. 145, 149, 447 A.2d 516, 518 (1982). Notwithstanding the possibility that the claim here for breach of this contractual duty is therefore barred by the six year statute of limitations, the implied duty of good faith and fair dealing does not operate to alter the clear terms of an agreement and may not be invoked to preclude a party from exercising its express rights under such an agreement. *Glenfed Financial Corp., Commercial Finance Div. v. Penick Corp.*, 276

---

7. The Murphys and TML assert by separate count that the individual defendants were grossly negligent in carrying out their duties as directors of TML. There is simply no evidence suggesting any gross negligence on the part of the individual defendants here.

8. The Court notes that at the first meeting of the shareholders and the Board of Directors held on April 23, 1985 after Fleming's interest had been bought out and there were no longer any directors on the Board who had been appointed by Fleming and the Murphys had complete control of TML, a resolution was adopted, after discussion, wherein all the prior acts of the directors and officers were ratified, approved and confirmed. (Defs.' App. at 171–72a).

9. The Murphys and TML assert that, in committing the alleged breaches of fiduciary duty, the Fleming defendants also violated the New Jersey Business Corporations Act, N.J.Stat.Ann. 14A:1–1 *et seq.* It appears that they specifically assert a violation of N.J.Stat.Ann. 14A:6–8. (*See* Compl. at 30). However, section 14A:6–8 provides, in part, that a contract or other transaction between two corporations, where the directors of one of the corporations is a director of or is otherwise interested in the other corporation, shall not be void or voidable solely by reason of such common directorship or interest if the fact of the common directorship or interest is disclosed or known to the shareholders, and they authorize, approve or ratify the contract or transaction. N.J.Stat.Ann. 14A:6–8(1)(c). Thus, notwithstanding that these claims are barred by the statute of limitations, section 14A:6–8 does not provide the Murphys or TML with a basis for relief.

N.J.Super. 163, 647 A.2d 852, 857–58 (App. Div.1994) (citations omitted). Thus, the Murphys and TML cannot assert this implied duty as a means of precluding Fleming from exercising its express rights under the lease agreements.[10]

As for the remaining claims by the Murphys and TML asserting violations of the New Jersey Franchise Act, N.J.Stat.Ann. 56:10–1 *et seq.*. However, since the purpose of this Act is to protect franchisees from the wrongful termination of franchises by franchisors and since it is undisputed that the Murphys and TML were the ones who terminated any arguable franchise relationship in 1989, this claim is without merit. *See Dunkin' Donuts of America, Inc. v. Middletown Donut Corp.*, 100 N.J. 166, 495 A.2d 66 (1985).

As for the remaining claims by the Murphys and TML asserting violations of the New Jersey Anti–Trust Act, N.J.Stat.Ann. 56:9–1 *et seq.*, the New Jersey Uniform Securities Law, N.J.Stat.Ann. 49:3–47 *et seq.*, and the New Jersey Consumer Fraud Act, N.J.Stat.Ann. 56:8–1 *et seq.*, there has been no evidence presented to this Court which supports a claim under any of these statutes. Moreover, the statute of limitations has expired for the assertion of these statutory claims: the New Jersey Anti–Trust Act[11] (four years); the New Jersey Uniform Securities Law[12] (two years); and the New Jersey Consumer Fraud Act (six years).[13] Further still, the doctrine of laches, which is defined as neglect, for an unreasonable and unexplained length of time under the circumstances, in asserting a claim, favors disallowing any such claims at this juncture. *See Lavin v. Board of Educ. of City of Hackensack*, 90 N.J. 145, 447 A.2d 516, 519 (1982). The doctrine of laches has been applied in cases of unreasonable delay to defeat claims despite the fact that the time fixed by the statute of limitations may not have passed. *See Patterson v. Hewitt*, 195 U.S. 309, 319, 25 S.Ct. 35, 37, 49 L.Ed. 214 (1904).

Accordingly, since the Murphys and TML are unable to demonstrate any basis upon which this Court may deny specific enforcement of the Sublease Agreement and the Build and Lease Agreement, this Court is duty bound to enforce the unambiguous provisions of these lease agreements, and the motion for summary judgment shall be granted.

**IT IS** therefore on this 2nd day of March, 1995, **ORDERED** that the motion for summary judgment by Fleming Companies, Inc., G. William Watson, John R. Traub, and Wayne Pendergast is hereby **GRANTED.**

---

10. The Murphys and TML allege that Fleming wrongfully failed to account for advertising dollars pursuant to an Agency Agreement executed in April of 1978. Murphy states that he was aware as early as 1979 "that there was advertising allowances and income that I wasn't getting." (Defs.' App. at 448a). As such, any cause of action for breach of contract, breach of fiduciary duty or fraud based on Fleming's alleged failure to account for advertising dollars accrued in 1979, the year in which the right to institute and maintain a suit first arose. *Hartford Accident and Indem. Co. v. Baker*, 208 N.J.Super. 131, 135–36, 504 A.2d 1250, 1252–53 (Law Div.1985). Thus, the statute of limitations started to run on such claims in 1979. Further, the running of the statute of limitations is not postponed by the fact that additional damages may have been subsequently sustained. *Id.; see also Stanley Development Co. v. Millburn Township.*, 26 N.J.Super. 328, 331, 97 A.2d 743, 743 (App.Div.1953); *Diamond v. New Jersey Bell Tel. Co.*, 51 N.J. 594, 242 A.2d 622 (1968). Accordingly, the claim for advertising dollars is without merit. *See also* discussion of laches *infra*.

11. N.J.Stat.Ann. 56:9–14.

12. N.J.Stat.Ann. 49:3–71(e).

13. *See D'Angelo v. Miller Yacht Sales*, 261 N.J.Super. 683, 619 A.2d 689, 691 (App.Div. 1993).